## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

|  |  |  |
|---|---|---|
| ROBERT S. HELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.** 06C-4240 |
| | ) | |
| AMERICAN AIRLINES, INC., ALLIED | ) | Judge Gettleman |
| PILOTS ASSN., JOHN W. JIRSCHELE, | ) | Magistrate Judge Denlow |
| JAMES G. SOVICH, JAMES A. | ) | |
| CONDES, AND MARTIN G. REEDY, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## DEFENDANT ALLIED PILOTS ASSOCIATION'S
## ANSWER TO COMPLAINT

As and for its Answer ("A") to Plaintiff's Complaint ("C"), Defendant Allied

Pilots Association ("APA") alleges and states as follows.[1]

C1.    This is an action to remedy the unlawful abridgement of the federally
protected statutory rights of a politically active union member who was fired by his
employer for political speech made entirely within the union hall that involved coarse
language directed toward a senior union official who was a supporter of a management
friendly faction within the union. Rather than the union attempting to internally
discipline the member for his political speech, union officials engaged in concealed and
coordinated activities with the employer and others to cause the termination of the union
member, and to deny the member fair representation by the union after termination.

A1.    The APA admits that plaintiff was terminated for certain speech as

established in the attachments to the Complaint but denies the remaining

allegations of Paragraph 1 of the Complaint.[2]

C2.    This action is brought pursuant to 45 U .S.C. § 152, Third and Fourth
alleging violations of the Railway Labor Act (45 U.S.C. § 151, et seq.) (hereinafter
"RLA"), the Labor-Management Reporting and Disclosure Reporting Act (29 U.S.C. §

---

[1]  Motions are currently pending to dismiss Counts I and III of the Complaint, and a briefing schedule is in
place. The APA is not named as a defendant as to Count I. Defendants Sovich and Condes are not named
as defendants as to Count II.
[2]  To the extent that the unnumbered headings scattered throughout the Complaint are intended to be
allegations, the APA denies each and every one of them.

401, et seq.) (hereinafter "LMRDA"), and the common law of the state of Illinois. HELD brings this action (a) against the defendant AMERICAN for unlawful termination of employment contrary to public policy in violation of the RLA, LMRDA, and the applicable collective bargaining agreement, and (b) against the defendant APA for breach of its duty of fair representation, and (c) against the defendants JIRSCHELE, SOVICH, CONDES, and REEDY for wrongful interference with plaintiffs employment.

A2.    The APA admits that plaintiff has brought this suit against the

named defendants but denies that the suit is colorable under the federal statutes or

Illinois common law referenced in Paragraph 2 of the Complaint and therefore

denies the remaining allegations of Paragraph 2.

C3.    Jurisdiction is conferred by 28 U .S.C. §§ 1331 and 1337.

A3.    Paragraph 3 of the Complaint states a legal conclusion to which no

response is required; to the extent a response is required, the APA denies the

allegations of Paragraph 3.

C4.    Venue is proper in the United States District Court for the Northern
District of Illinois pursuant to 28 U.S.C. § 1391, as AMERICAN is a corporation doing
business in this district.

A4.    To the extent that Paragraph 4 of the Complaint concerns only

defendant American Airlines. Inc., a response is not required by the APA.  To the

extent Paragraph 4 makes allegations concerning  the APA, the APA denies those

allegations.

C5.    Prior to being hired as a pilot for AMERICAN, HELD was a fighter pilot
in the U.S. Air Force with a Top Secret security clearance.

A5.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 5 of the Complaint and therefore denies those

allegations.

C6.    HELD served on active duty in the Air Force for seven years and was
honorably discharged in 1988 having earned the rank of Captain.

A6.     The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 6 of the Complaint and therefore denies those

allegations.

C7.     HELD was hired as a pilot by AMERICAN in 1988. At all times relevant
to the allegations herein, until his termination, HELD was employed and qualified as an
airline pilot of AMERICAN, holding the position of International First Officer.

A7.     The APA admits that Held was hired by American as a pilot and

that for a certain period of time held the position of International First Officer.

Because the time periods the Plaintiff deems "relevant" to the allegations of the

Complaint vary and are not always clear, the APA lacks information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 7 of the

Complaint and therefore denies those allegations.

C8.     At all times relevant to the allegations herein, until his termination, HELD
was a member of APA.

A8.     APA admits the allegations of Paragraph 8 of the Complaint.

C9.     In his nearly 17-year career at AMERICAN, HELD became well-known
by the parties to this Complaint as a vocal union member and activist whose record
included numerous grievances over institutional matters, several campaigns for elected
union offices, and a lawsuit against AMERICAN for violation of the Railway Labor Act.[1]
[Footnote 1 See *Held v. American Airlines*, 13 F. Supp 2d 20 (D.D.C. 1998) (RLA's mechanisms for
resolving "minor" disputes does not preempt causes of action to enforce rights independent of collective
bargaining agreement even if the claim could be grieved on contractual grounds.)]

A9.     The APA admits that Held filed a number of contractual

grievances, ran for elected union office on more than one occasion and brought

the lawsuit referenced in Paragraph 9 of the Complaint and accompanying

Footnote 1.  Because of the ambiguity of some of the terms used in Paragraph 9

(e.g., "vocal union member and activist"; "grievance over institutional matters")

the APA lacks information sufficient to form a belief as to the truth of those

3

allegations and therefore denies them. The parenthetical in Footnote 1 states a legal conclusion to which no response is required; to the extent that a response is required, the allegation of the parenthetical is denied.

C10.    During his career, HELD had taken one or more strong political positions against the political positions of each of the defendants in this case.

A10.    The APA denies the allegations of Paragraph 10 of the Complaint to the extent they suggest that Held took political positions against the APA or that the APA took any political position with respect to him. The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 10 and therefore denies those allegations.

C11.    Since 1996, in addition to his career and employment as an American Airlines pilot, HELD has been an attorney licensed to practice in Illinois.

A11.    The APA admits that at some point in time, Held became an attorney but lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 11 of the Complaint and therefore denies those allegations.

C12.    At all times relevant to the allegations herein HELD has been a citizen of the United States and a resident of Illinois.

A12.    The APA admits that Held is a citizen of the United States and that, for a certain period of time, has been a resident of Illinois but lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 12 of the Complaint and therefore denies those allegations.

C13.    AMERICAN is a passenger airline operating under Part 121 of the Federal Aviation Regulations (14 C.F.R. 121).

A13.    The APA admits the allegations of Paragraph 13 of the Complaint.

C14.    AMERICAN is wholly owned by AMR Corporation, a Delaware corporation with its corporate headquarters in Fort Worth, Texas.

A14.    The APA admits the allegations of Paragraph 14 of the Complaint.

C15.    AMERICAN maintains offices, transacts business and performs services in Illinois.

A15.    The APA admits the allegations of Paragraph 15 of the Complaint.

C16.    APA is a national labor organization within the meaning of the LMRDA[2] and is the recognized collective bargaining representative for the airline pilots in the service of AMERICAN according to the provisions of the RLA.  [Footnote 2 See 29 U.S.C. § 402(i) and (j).]

A16.    To the extent Paragraph 16 of the Complaint and the

accompanying Footnote 2 state legal conclusions, no response is required; to the

extent that a response is required, those allegations are denied.  The APA admits

the remaining allegations of Paragraph 16.

C17.    APA maintains its headquarters in Fort Worth, Texas.

A17.    The APA admits the allegations of Paragraph 17 of the Complaint.

C18.    APA has chartered nine local labor organizations within the meaning of the LMRDA[3] in the United States, with each local being co-located with pilot bases of AMERICAN, referred to by APA as "domiciles," including the Chicago ("APA ORD") and Boston ("APA BOS") Domiciles.  [Footnote 3 29 U.S.C. § 402(j)(3).]

A18.    To the extent Paragraph 18 and accompanying Footnote 3 of the

Complaint state legal conclusions, no response is required; to the extent a

response is required, those allegations are denied.  The APA admits the remaining

allegations of Paragraph 18.

C19.    The APA Chicago Domicile ("APA ORD") is chartered by APA within the District.

A19.    The APA admits the allegation in Paragraph 19 of the Complaint

that its Chicago Domicile is chartered and located in Chicago, Illinois.  If by

"District" Paragraph 19 means the geographical area covered by the District

Court for the Northern District of Illinois, the APA admits that allegation. If

some other meaning is intended, the APA lacks information sufficient to form a

belief as to the truth of the allegation and therefore denies it.

C20.    JIRSCHELE, on information and belief, is a resident of the state of Illinois.

A20.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 20 of the Complaint and therefore denies

those allegations.

C21.    JIRSCHELE is the most senior management supervisor of pilots for AMERICAN at Chicago O'Hare Airport. He holds the title of Director of Flight – ORD and is assigned by AMERICAN to Chicago O'Hare Airport.

A21.    Due to the ambiguity of the term "most senior," the APA lacks

information sufficient to form a belief as to the truth of that allegation of

Paragraph 21 of the Complaint and therefore denies the allegation. The APA

admits the remaining allegations of Paragraph 21.

C22.    SOVICH, on information and belief, is a resident of the state of New Hampshire.

A22.    The APA admits the allegations of Paragraph 22 of the Complaint.

C23.    SOVICH is assigned by AMERICAN to duty at Boston Logan Airport.

A23.    The APA admits the allegations of Paragraph 23 of the Complaint.

C24.    SOVICH has previously been elected and served as President of APA – the highest APA office – and was President while REEDY was an officer of APA.

A24.    The APA admits the allegations of Paragraph 24 of the Complaint

concerning Sovich but denies the allegations concerning Reedy.

C25.    SOVICH currently holds the elected union office of Chairman of APA BOS and, thereby, serves on the APA BOD.

A25.    To the extent the term "union office" designates an "office" in the APA BOS Domicile, the APA admits that allegation; to the extent it does not, the APA denies the allegation.  The APA admits the remaining allegations of Paragraph 25 of the Complaint.

C26.    SOVICH's actual role and activities within APA are inconsistent with, and disproportionate to, his status as the chairman of a small local.

A26.    The APA denies the allegations of Paragraph 26 of the Complaint.

C27.    SOVICH undertakes frequent "paid union leave" absence from work for AMERICAN and frequently works at APA headquarters in Fort Worth, Texas.

A27.    The APA admits the allegations of Paragraph 27 of the Complaint. The APA further states that the "paid union leave" system under which Sovich operates is the same as that applied to other elected APA domicile officials and members of APA committees.

C28.    SOVICH received more money from APA during the fiscal year ending June 30, 2005 than any other officer of APA, including the APA national officers.

A28.    The APA admits the allegations of Paragraph 28 of the Complaint and further states that the amount of money Sovich receives from the APA is entirely a function of the significant amount of time he spends on union business.

C29.    On information and belief, SOVICH wields substantial influence and control over the employees of APA, as well as having a significant say regarding their continued employment.

A29.    The APA denies the allegations of Paragraph 29 of the Complaint.

C30.    CONDES, on information and belief, is a resident of the state of Indiana.

A30.    The APA admits the allegations of Paragraph 30 of the Complaint.

C31.    CONDES is assigned by AMERICAN to duty at Chicago O'Hare Airport.

A31.    The APA admits the allegations of Paragraph 31 of the Complaint.

C32.    CONDES currently holds the elected union office of Vice Chairman of APA ORD and, thereby, serves on the APA BOD.

A32.    To the extent that the term "union office" in Paragraph 32 of the Complaint refers to an office in the APA ORD Domicile, the APA admits that allegation; to the extent the term is intended to have some other meaning, the allegation is denied.  The APA admits the remaining allegations of Paragraph 32.

C33.    REEDY, on information and belief, is a resident of Illinois and is a supervisory pilot ("Check Airman") assigned by AMERICAN to duty at Chicago O'Hare Airport.

A33.    The APA denies that Reedy is a "supervisory pilot" but admits the remaining allegations of Paragraph 33 of the Complaint.

C34.    REEDY has previously been elected and served as an officer of APA as APA ORD Vice Chairman and, thereby, is a former member of APA's Board of Directors ("APA BOD").

A34.    The APA admits that, at a certain point in time, Reedy was elected APA ORD Vice Chairman and during the time he held that position, he served on the APA's Board of Directors.  The APA denies the remaining allegations of Paragraph 34 of the Complaint.

C35.    HELD was terminated for allegedly violating a non-negotiated company policy that purports to regulate the conduct of employees at all times regardless of (a) union representation, and (b) whether they are on or off duty, and (c) whether they are on or off premises, or (d) inside the union hall.

A35.    The APA admits that Held was terminated but denies the

remaining allegations of Paragraph 35 of the Complaint.  The attachments to the

Complaint, which speak for themselves, establish the reasons for the termination.

C36.    AMERICAN's rules go well beyond complying with laws requiring a
workplace free of discrimination such that AMERICAN has seriously disrupted and
interfered with the proper balance between the right of employees to work in a workplace
free of discrimination while also maintaining the right of individuals to think and behave
freely away from work and, in particular, engage in robust political speech and activity
regarding union officials.

A36.    Paragraph 36 of the Complaint states a series of legal conclusions

to which no response is required; to the extent that a response is required, those

allegations are denied.

C37.    In spite of the recognized collective bargaining relationship and the
collective bargaining agreement ("the Contract") in full force and effect between APA
and AMERICAN, AMERICAN had previously – and unilaterally – published and
amended a series of numbered "Rules of Conduct."

A37.    The APA admits that a collective bargaining relationship and a

collective bargaining agreement exists between APA and American and further

admits that American has published and amended "Rules of Conduct" which are

not contained in the collective bargaining agreement but denies the remaining

allegations of Paragraph 37 of the Complaint.

C38.    AMERICAN has sought to impose its Rules of Conduct to purportedly
regulate the conduct of employees at all times of their lives including their private and
personal lives, regardless of (a) whether the employee is on or off duty, (b) whether the
employee is in or outside the work environment or even on the employer's property, (c)
the existence of any collective bargaining relationships and the provisions of collective
bargaining agreements, (d) setting, and (e) the otherwise protected nature of the conduct.

A38.    To the extent that Paragraph 38 of the Complaint sets forth

assertions of personal opinion rather than fact, the APA denies those allegations.

To the extent that Paragraph 38 purports to set forth allegations concerning the

intentions of American, the APA lacks information sufficient to form a belief as

to the truth of those allegations and therefore denies them.

C39.    AMERICAN's Rules of Conduct contain one or more "zero tolerance" provisions that are inconsistent with the rights of employees represented by a union.

A39.    The APA admits that American's Rules of Conduct contain certain

"zero tolerance" provisions but denies the remaining allegations of Paragraph 39

of the Complaint.

C40.    Employees represented by a union are entitled to safeguards against discipline and termination not available to "at will" employees.

A40.    The APA denies the allegations of Paragraph 40 of the Complaint.

The APA would further state that employment safeguards derive from

collectively bargained agreements and statutory law, not from the mere fact of

union representation.

C41.    One such Rule of Conduct imposed by AMERICAN is Rule 32 which incorporates a Work Environment Policy ("WEP") prohibiting employees from engaging in conduct that suggests hatred or hostility against a person because of their "protected characteristic."

A41.    The APA admits the allegations of Paragraph 41 of the Complaint

as to the existence of Rule 32 and its referenced Work Environment Policy, both

of which speak for themselves, but denies the allegations purporting to

characterize the substance of the Rule and the Policy.  The APA would further

state that Rule 32 and the related Work Environmental Policy are set forth

verbatim in Exhibit 1 to the Complaint (Letter of Termination).

C42.    The Rule 32 and WEP provide for punishment - up to and including termination – for even one instance of misconduct regardless of prior work record.

A42.    The APA admits the allegations of Paragraph 42 of the Complaint.

C43.    AMERICAN has sought to impose its Rule 32 for off-duty and off-premises conduct by employees regardless of whether the alleged conduct meets any of the four commonly accepted arbitral standards for sufficient "nexus" to the workplace.[4]
[Footnote 4 See Elkollri & Elkouri, *How Arbitration Works*, 938-939 (6th Ed.) citing *W.E. Caldwell Co.*, 28 LA 434 (Kesselman, 1957) and *Procter & Gamble*, 114 LA 1185, 1187 (Allen, Jr. 2000); see also Marvin Hill and James Wright, *Employee Lifestyle and Off-Duty Conduct Regulation*, 168 (BNA Books 1993).]

A43.    Paragraph 43 of the Complaint and accompanying Footnote 4 set forth legal conclusions to which no response is required; to the extent a response is required, the allegations are denied.  To the extent Paragraph 43 contains allegations concerning the intentions of American, the APA lacks information sufficient to form a belief as to the truth of those allegations and therefore denies them.

C44.    During testimony and briefs about events giving rise to this complaint, AMERICAN advanced a theory that sufficient workplace nexus exists when one employee says something to another employee in the presence of other employees, regardless of the setting, and regardless of the otherwise protected nature of the speech or the protected nature of the location or setting in which the speech occurred.

A44.    The APA admits that American presented testimony and filed briefs in connection with the arbitration of Held's grievance challenging his termination and admits that American stated certain theories in its briefs and arguments at the hearing, and that testimony (set forth in Ex. 5 to the Complaint) and those briefs speak for themselves.  In that the remaining allegations of Paragraph 44 of the Complaint attempt to characterize the substance of such testimony, theories and arguments, the APA denies these allegations.

C45.    AMERICAN has stated that it can punish employees for violation of Rule 32 for conduct between two married employees at home in their own bedroom.

A45.    The APA is aware of no such statement by American and therefore denies the allegations of Paragraph 45 of the Complaint.

C46.    AMERICAN cannot cite a single case where an employer has ever been held liable for conduct of union members that occurred entirely within the union hall.

A46.    The APA lacks information sufficient to form a belief as to what American can or cannot do and therefore denies the allegations of Paragraph 46 of the Complaint.

C47.    Despite lack of any legal liability to an employer for conduct among union members in a union hall, AMERICAN has sought to apply Rule 32 to speech made within APA's union hall and on speech by and between union members about union issues, their choice of union representatives, and the conduct of such union officials.

A47.    To the extent Paragraph 47 of the Complaint states legal conclusions, no response is required; to the extent a response is required, those allegations are denied.  To the extent Paragraph 47 contains allegations concerning the intentions of American, the APA lacks information sufficient to form a belief as to the truth of those allegations and therefore denies them.

C48.    Well prior to the events giving rise to this complaint, the APA BOD engaged in one or more meetings with Gerard Arpey (Chairman, President, and Chief Executive Officer of AMERICAN and its parent, AMR Corp.) and Gary Kennedy (Senior Vice President and General Counsel of AMR Corp.) during which APA made clear its position that "off duty," as described in Rule 32 and the WEP could only lawfully n1ean when the employee was off duty but in the work environment or on company property ("the Arpey Meeting").

A48.    The APA admits that the Arpey Meeting took place and was attended, *inter alia*, by the people referenced in Paragraph 48 of the Complaint but denies that the APA "made clear" the "position" alleged in Paragraph 48.

C49.    AMERICAN has informed employees that the WEP prohibiting harassment and other behavior "exceeds what the law allows."

A49.    The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 49 of the Complaint and therefore denies those allegations.

C50.    AMERICAN has adopted rules that have a purpose of not only complying with the law, but to go beyond that – with inadequate regard for employees' and union members' free speech rights.

A50.    To the extent Paragraph 50 of the Complaint states legal conclusions, no response is required; to the extent a response is required, those allegations are denied.  To the extent Paragraph 50 contains allegations concerning American's intentions or purposes, the APA lacks information sufficient to form a belief as to the truth of those allegations and therefore denies them.

C51.    AMERICAN has adopted such over-reaching rules in an unlawful attempt to selectively discipline employees and to impose restrictions on its employees in order to create, for marketing purposes, a "public face" of American and its moral views.

A51.    To the extent that Paragraph 51 asserts legal conclusions, no response is required; to the extent a response is required, the APA denies those allegations.  The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 51 of the Complaint and therefore denies those allegations.

C52.    On information and belief, AMERICAN is the only major airline to have a sales program ("the Rainbow Sales Team") dedicated to the pursuit of business from the Gay, Lesbian, Bisexual, Transgender ("GLBT") community.

A52.    The APA admits that American has established a sales team to pursue business, *inter alia*, from the Gay and Lesbian community but lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 52 of the Complaint and therefore denies those allegations.  The APA further states that American applies marketing strategies of various kinds to

various potential customer groups in order to expand the business and

profitability of the company.

C53.    On information and belief, AMERICAN sponsors organizations and
events such as Gay Games VII.

A53.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 53 of the Complaint and therefore denies

those allegations.

C54.    On information and belief, AMERICAN solicits the endorsement of
advocacy groups such as the Human Rights Campaign ("HRC") by documenting their
sponsorship of such events.

A54.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 54 of the Complaint and therefore denies

those allegations.

C55.    On information and belief, AMERICAN provides advocacy groups such
as HRC with details of AMERICAN's philanthropy within, and targeted marketing to,
the GLBT community, and provides such advocacy groups with the details of
AMERICAN's Rules of Conduct, required employee training, and evidence of Rules
enforcement so that such groups will prominently recognize AMERICAN in reports and
news coverage.

A55.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 55 of the Complaint and therefore denies

those allegations.

C56.    HELD was terminated for the sole reason that he posted a single message
inside a password-protected, union-run, "virtual union hall" in which he directed coarse
language toward a specific union official.

A56.    The APA admits that, as set forth in the attachments to the

Complaint, Held was terminated for posting a message, determined by a neutral

14

arbitrator to constitute "hate speech," on a password-protected union sponsored

"virtual union hall" with an express invitation that the message be re-transmitted

anywhere a reader might choose.  The APA denies the remaining allegations of

Paragraph 56 of the Complaint.

C57.    This termination was effected by AMERICAN under the presumption that AMERICAN has the obligation to regulate and restrict all employee speech, including speech of union members critical of union officials made in the union hall.

A57.    The APA lacks information sufficient to form a belief as to what

"presumption" American may or may not have had and therefore denies the

allegations of Paragraph 57 of the Complaint.

C58.    In 1993, APA established a private, APA members-only, password-protected, electronic bulletin board ("Challenge & Response," or "C&R").

A58.    The APA admits the allegations of Paragraph 58 of the Complaint.

C59.    C&R was developed and is owned and operated exclusively by APA as a union-sponsored electronic bulletin board providing lawful support for political free speech by union members protected under the Bill of Rights of union members in Title I of the LMRDA (29 U.S.C. § 411).

A59.    APA admits that APA developed, "owns," operates and sponsors

C&R as an electronic vehicle through which APA members can communicate

with each other on matters of interest.  To the extent Paragraph 59 of the

Complaint states legal conclusions, no response to those allegations is required; to

the extent a response is required, those allegations are denied.  The APA further

denies that "bulletin board" is an accurate or appropriate description of C&R.

C60.    Since 1996, APA has continuously maintained a web site at the Internet address of http://www.alliedpilots.org ("APA web site").

A60.    The APA admits the allegations of Paragraph 60 of the Complaint.

C61.    Since February 1998, APA has continuously maintained the C&R service as a segregated section of the APA web site using equipment at APA headquarters.

A61.    The APA admits the allegations of Paragraph 61 of the Complaint

except for the date referenced, which is denied.

C62.    In December 1999, the APA BOD unanimously recognized "the importance of free and open discussion between members on union- and work-related matters" and stated that APA had "a rich tradition in supporting the democratic process by providing space and services for such free and open discussion using electronic means such as 'Challenge & Response' (C&R)."

A62.    The APA admits the allegations of Paragraph 62 of the Complaint.

C63.    As airline pilots in the service of a major international airline, the APA

union membership experiences unique and substantial geographic and chronologic

dislocation that makes difficult any frequent gathering for face-to-face discourse in a

"brick-and-mortar" union hall.

A63.    The APA denies that APA members experience "dislocation" or

that their experience is "unique" (*e.g.*, among pilots flying for international

airlines) but admits the remaining allegations of Paragraph 63 of the Complaint.

C64.    Given the distance and scheduling obstacles to frequent gathering of commercial airline pilots, and given the existence of the specialized, password-protected, private, union-run C&R service, this electronic medium serves as a viable and vibrant supplement to - and frequent substitute for - the traditional brick-and-mortar "union hall" for all purposes relevant to this Complaint.

A64.    The APA admits that C&R functions as a supplement to and

frequently a substitute for a physical "union hall for many members" but, in light

of the vagueness and ambiguity of the other allegations of Paragraph 64 of the

Complaint, the APA lacks information sufficient to form a belief as to the truth of

those remaining allegations and therefore denies them.

C65.    In addition to views expressed during the Arpey Meeting, APA notified AMERICAN in writing on February 24, 2004 that union member participation within C&R was fully protected by the United States Constitution and federal law.

A65.    The APA admits that then-President Darrah wrote a February 24, 2004, letter to American's Bob Shore relating to C&R, which letter speaks for itself.  The APA denies the allegations of Paragraph 65 of the Complaint that attempt to characterize the substance of that letter and denies the remaining allegations of Paragraph 65.

C66.    The February 24, 2004 letter from APA President John Darrah to the Base Manager of the New York pilot base of AMERICAN, Bob Shore, was sent in response to a February 19, 2004 letter from AMERICAN's Doug Arnett to the APA LGA Chairman Sam Mayer ("Mayer") demanding that Mayer provide the names of individual union members who posted specific messages to C&R.

A66.    The APA admits that then-President Darrah's February 24, 2004, letter to Mr. Shore referred to a February 19, 2004, letter from American's Doug Arnett to APA LGA Chairman Sam Mayer, both of which letters speak for themselves.  The APA denies the remaining allegations of Paragraph 66 of the Complaint in that they attempt to characterize the substance of those letters.

C67.    During the course of his representation of another pilot accused of violating Rule 32 in a posting to C&R, Mayer had produced and provided to AMERICAN a series of posts from other members while redacting identifying details.

A67.    The APA admits the allegations of Paragraph 67 of the Complaint.

C68.    Mr. Arnett's February 19, 2004 letter made clear that the purpose of his demand was to investigate and prosecute additional union members for violating Rule 2 for their posts to C&R.

A68.    APA admits that Mr. Arnett sent a February 19, 2004, letter relating to C&R, which letter speaks for itself.  The APA denies the allegations of

Paragraph 68 of the Complaint that attempt to characterize the substance of that

letter.

C69.    After receiving the February 24, 2004 reply from APA rejecting the request for such identification, AMERICAN took no further action to identify or prosecute the union members for their posts on C&R.

A69.    APA lacks information sufficient to form a belief as to the truth of

the allegations of Paragraph 69 of the Complaint and therefore denies those

allegations.

C70.    By being aware of the allegedly offensive C&R posts and taking no further action to investigate or prosecute individuals whom they believed had violated Rule 32 in those posts, AMERICAN agreed with APA's position and set the precedent that union member participation on C&R was not subject to AMERICAN's Rules of Conduct.

A70.    APA lacks information sufficient to form a belief as to what

American did or did not "agree" to and therefore denies the allegations of

Paragraph 70 of the Complaint.

C71.    By taking no further action, AMERICAN agreed that APA had no duty to disclose the identities of participating union members to facilitate such investigation and discipline.

A71.    APA lacks information sufficient to form a belief as to what

American did or did not "agree" to and therefore denies the allegations of

Paragraph 71 of the Complaint.

C72.    By January 2005, APA had repeatedly notified AMERICAN of its position that political activities by union members who were off duty and off premises and in the union hall could not be lawfully subject to the non-negotiated rules and policies of AMERICAN.

A72.    APA admits that by January 2005, it had stated to American its

views on the political activities of its members on numerous occasions but denies

the remaining allegations of Paragraph 72 of the Complaint. To the extent

Paragraph 72 states a legal conclusion, no response is required; to the extent a

response is required, those allegations are denied.

C73. AMERICAN never informed its employees or HELD of its position that its Rules of Conduct could or would ever be applied to a union member's criticism of a union official entirely within the union hall.

A73. APA lacks information sufficient to form a belief as to what

American may have informed Held or other unidentified employees concerning

the applicability of the Rules of Conduct to criticism within the union hall and

therefore denies the allegations of Paragraph 73 of the Complaint. The APA

would further state that the allegations of Paragraph 73 appear to contradict the

allegations of Paragraphs 38, 43, 45, 47, 49, 50 and 51 of the Complaint.

C74. APA did not disclose to HELD the existence or content of the February 24, 2004 letter describing APA's position on the protected nature of C&R until July 18, 2005, when it was included with several hundred pages of documents disclosed to AMERICAN that same day.

A74. The APA admits that it disclosed President Darrah's February 24,

2004, letter to American and Held during July 2005, but denies the remaining

allegations of Paragraph 74 of the Complaint and denies that the letter was not

accessible to Held before July 2005.

C75. HELD did not know of the existence or content of the February 24, 2004 letter until after he had been terminated for violating an employer rule he believed could not apply to protected union activity.

A75.   The APA lacks information sufficient to form a belief as to the

allegations of Paragraph 75 of the Complaint and therefore denies those

allegations.

C76.   On Saturday, January 22, 2005, HELD was at his home, not on duty with
AMERICAN and had no obligation for duty with AMERICAN.

A76.   The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 76 of the Complaint and therefore denies

those allegations.

C77.   On January 22, 2005, while using his computer in his home, HELD posted
a message on C&R in response to an ongoing political discussion exclusively among
union members about the actions of the Chairman of the APA Appeal Board and union
members' choice of representatives.

A77.   The APA admits that on January 22, 2005, Held posted a written

message on C&R, apparently from his home computer, a message that speaks for

itself.  The APA denies the remaining allegations of Paragraph 77 of the

Complaint in that they attempt to characterize the substance of Held's posting and

other postings, which also speak for themselves.

C78.   The APA Constitution and Bylaws charges the APA Appeal Board with
adjudication of internal union member disputes and describes a mechanism for such
disputes to be heard and adjudicated.

A78.   The APA admits the allegations of Paragraph 78 of the Complaint.

C79.   The APA Appeal Board can impose punishment on an APA member
including expulsion from the union.

A79.   The APA admits the allegations of Paragraph 79 of the Complaint.

C80.    Any punishment of a union member by the APA Appeal Board has no lawful effect on the disciplined member's employment with AMERICAN.

A80.    The APA admits the allegations of Paragraph 80 of the Complaint

to the extent that they state that the APA Appeal Board can only impose intra-

union sanctions and has no authority to impose employment sanctions.

Otherwise, the APA denies the allegations of Paragraph 80.

C81.    The APA BOD elects all members of the APA Appeal Board including the Chairman, from the general membership of APA, to two-year terms.

A81.    The APA admits the allegations of Paragraph 81 of the Complaint.

C82.    On January 22, 2005, union members were using C&R to discuss the conduct of one of the elected officials of APA, the Chairman of the Appeal Board, Gary Weller ("Weller").

A82.    The APA admits the allegations of Paragraph 82 of the Complaint

to the effect that some APA members posted messages on C&R on January 22,

2005, regarding Gary Weller, the Chairman of the APA Appeal Board.

Otherwise, the APA denies the allegations of Paragraph 82.

C83.    Weller was elected to the Appeal Board in 1991, was elected to be Chairman in 1994, and has been successively re-elected Chairman such that he has been Chairman continuously for over 10 years.

A83.    The APA admits the allegations of Paragraph 83 of the Complaint.

C84.    On January 21, 2005, the union member participants in the ongoing political dialogue on C&R began discussing their concerns about the conduct of the elected leadership of APA.

A84.    Because of the ambiguity of the phrasing of the allegations in

Paragraph 84 of the Complaint, the APA lacks information sufficient to form a

belief as to the truth of the allegations and therefore denies them.

C85.    On January 21, 2005, one union member began a "thread" to discuss reports that one elected leader, Weller, had made one or more complaints to AMERICAN about another union member's exercise of off-duty, off-premises union political speech.

A85.    The APA admits that on January 21, 2005, a union member made a posting on C&R concerning Gary Weller.  The APA denies the remaining allegations of Paragraph 85 of the Complaint.

C86.    The union members' on-line discussion on that thread centered on their outrage that Weller's had complained to AMERICAN rather than use internal union methods for dispute resolution within the provisions of the APA Constitution and Bylaws.

A86.    The APA admits that certain C&R postings on the day in question concerned Weller's alleged complaint to American, and those postings speak for themselves.  The APA denies the allegations of Paragraph 86 of the Complaint that attempt to characterize the substance of those postings.

C87.    Weller was aware of, and intimately familiar with, internal union methods for dispute resolution because of his longstanding role as Chairman of the Appeal Board.

A87.    The APA admits the allegations of Paragraph 87 of the Complaint.

C88.    Specifically, Weller was alleged to have complained to AMERICAN about the political activity of fellow union member Alan Pollenz ("Pollenz") in September and October 2004.

A88.    Given the ambiguity of the phrasing of the allegations of Paragraph 88 of the Complaint, the APA lacks information sufficient to form a belief as the truth of those allegations and therefore denies them.

C89.    Pollenz – while off-duty and off-premises – had been critical of Weller's performance as Chairman of the Appeal Board.

A89.    The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 89 of the Complaint and therefore denies them.

C90.    Weller's complaint to AMERICAN about Pollenz was entirely unrelated to Pollenz' performance as an airline pilot for AMERICAN.

A90.    Paragraph 90 of the Complaint states what appears to be a legal

conclusion, to which no response is required; to the extent a response is required,

the allegations of Paragraph 90 are denied.

C91.    The complaints made by Weller to AMERICAN used verbiage demonstrating that Weller sought to cause Pollenz to be disciplined or terminated by AMERICAN for violation of the WEP within Rule 32.

A91.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 91 of the Compliant and therefore denies

those allegations.

C92.    HELD posted the 14th message in this C&R thread on January 22,2005.

A92.    The APA admits that Held made his posting on January 22, 2005,

but lacks information sufficient to form a belief as to the truth of the remaining

allegations of Paragraph 92 of the Complaint and therefore denies those

allegations.

C93.    HELD's January 22, 2005 C&R post was reflective of years of his own dissatisfaction with Weller's performance in his union role as Chairman of the Appeal Board.

A93.    The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 93 of the Complaint and therefore denies

those allegations.

C94.    HELD was also deeply concerned about the unwillingness of the other elected representatives of APA to restrain, sanction, or replace Weller as Chairman of the Appeal Board.

A94.   De APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 94 of the Complaint and therefore denies those allegations.

C95.   In his January 22, 2005 C&R post, as part of the ongoing on-line criticism among some union members regarding Weller's actions, HELD lashed out by directing a flurry of ridiculous insults toward Weller.

A95.   The APA admits that Held made a C&R posting regarding Weller on January 22, 2005, which speaks for itself.  The APA denies the self-serving allegations of Paragraph 95 of the Complaint that attempt to characterize the substance of that posting.  The APA would further state that a System Board of Adjustment arbitrator found that Held's posting constituted "hate speech."  See Exhibit 7 to the Complaint (System Board Decision).

C96.   Violation of the WEP incorporated into Rule 32 for this one C&R post was cited by AMERICAN as the sole basis for termination of HELD's employment.

A96.   Given the ambiguity and vagueness of the language used, the APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 96 of the Complaint and therefore denies those allegations.

C97.   AMERICAN'S sole reason for terminating HELD was that his January 22, 2005 C&R post allegedly referred to "another American Airlines pilot in demeaning and hateful terms."[5]   [Footnote 5 See, Exhibit 1, Letter of Termination of HELD, April 4, 2005.]

A97.   The APA admits that the language quoted in Paragraph 97 of the Complaint and accompanying Footnote 5 appears in Held's April 4, 2005, Letter of Termination, which speaks for itself and is attached to the Complaint as Ex. 1. The APA denies the allegations of Paragraph 97 that attempt to characterize the substance of the Letter of Termination.

C98.    HELD's criticism of Weller was motivated solely by union politics, was meant only to criticize such politics, and was intended solely as ridicule within the context of a serious political debate to draw attention to Weller's union conduct amongst union members.

A98.    In light, *inter alia*, of the allegations of Paragraphs 51-55 of the Complaint, the APA denies the allegations of Paragraph 98 of the Complaint.

C99.    Contrary to AMERICAN's sole reason for termination, notwithstanding the fact the activity was away from work and inside the union hall, HELD's criticism of Weller did not even meet AMERICAN's work environment definition of "hate-related" conduct because HELD did not suggest "hatred for or hostility toward [Weller] because of [Weller's] race, sex, sexual orientation, religion or other protected characteristic."

A99.    Paragraph 99 of the Complaint sets forth legal conclusions to which no response is required (and which are incorrect in any case); to the extent a response is required, those allegations are denied.  The APA further states that the System Board of Adjustment expressly found that the posting constituted "hate speech."  See Ex. 7 to the Complaint.

C100.  HELD's January 22, 2005 C&R post was protected from employer interference under the RLA (45 U.S.C. § 152, Third and Fourth).

A100.  Paragraph 100 of the Complaint states legal conclusions, to which no response is required; to the extent that a response is required, the allegations are denied.

C101.  HELD's January 22, 2005 C&R post was protected from employer and union interference by the Bill of Rights of union members in Title I of the LMRDA (29 U.S.C. § 411).

A101.  Paragraph 101 of the Complaint states legal conclusions, to which no response is required; to the extent that a response is required, the allegations of Paragraph 101 are denied.

C102.  The APA web site can be accessed in AMERICAN's work environment by union members using AMERICAN computers and network but with an important exception: The C&R system is segregated from the rest of the private members-only area of the APA web site and cannot be accessed from AMERICAN computers/network.

A102.  The APA admits the allegations of Paragraph 102 of the Complaint.

C103.  An APA member's ability to read and post messages on C&R from AMERICAN's workplace is explicitly prohibited and electronically blocked pursuant to a January 8, 2004 letter of agreement[6] amending Section 24 of the Contract.[7]  [Footnote 6 See, Exhibit 12, Letter of Agreement, January 8, 2004; Footnote 7 See, Exhibit 11, Section 24.]

A103.  The APA admits the existence of the January 8, 2004, letter, and Section 24 of the Collective Bargaining Agreement referenced in Paragraph 103 of the Complaint and accompanying Footnotes 11 & 12.  Because both of those documents speak for themselves, the APA denies the allegations of Paragraph 103 in that they seek to characterize the substance of those documents.

C104.  The January 8, 2004 letter of agreement had been reached as the result of a grievance that HELD had filed in a letter to JIRSCHELE on May 28, 2002.

A104.  The APA denies the allegations of Paragraph 104 of the Complaint.

C105.  As the result of the grievance filed by HELD, all members of APA now have the ability to access the union web site from AMERICAN's workplace.

A105.  The APA denies the allegations of Paragraph 105 of the Complaint.

C106.  Until July 11, 2005, when APA counsel Tricia Kennedy sent HELD a copy of the January 8, 2004 letter of agreement, HELD had never been informed of the existence of, or provided any copies of, the January 8, 2004 letter of agreement.

A106.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 106 of the Complaint and therefore denies the allegations.

C107. The terms of the January 8, 2004 letter of agreement required meetings and review by the Chief Pilot at each AMERICAN base, including JIRSCHELE.

A107. Because the letter referenced in Paragraph 107 of the Complaint speaks for itself, the APA denies the allegations of Paragraph 107, which attempt to characterize the substance of that letter.

C108. On February 10, 2005, after being notified of his suspension by AMERICAN, HELD wrote to APA President Ralph Hunter ("Hunter") and asked for copies of any agreements between APA and AMERICAN which described the terms under which APA members could access the APA web site from within the workplace of AMERICAN.

A108. The APA admits that Held wrote a letter to APA President Hunter on February 10, 2005, and that letter speaks for itself. The APA denies the allegations of Paragraph 108 of the Complaint which seek to characterize the substance of that letter.

C109. On February 11, 2005, Hunter replied. Despite being a member of the APA Negotiating Committee when the January 8, 2004 letter of agreement was reached, Hunter denied the existence of any written agreements regarding the ability to access the APA web site from AMERICAN's workplace, saying "we do not have documentation."

A109. The APA admits that Hunter was a member of APA's Negotiating Committee as of January 8, 2004, and admits that Hunter wrote Held a letter on February 11, 2004, which speaks for itself and contains the language quoted in Paragraph 109 of the Complaint as well as additional language. The APA denies the remaining allegations of Paragraph 109 that attempt to characterize the substance of that letter.

C110. HELD's political speech in C&R was not made within the work environment of AMERICAN.

A110. Paragraph 110 of the Complaint states legal conclusions, to which no response is required; to the extent a response is required, the allegations of Paragraph 110 are denied.

C111. HELD did not make his political speech available within the work environment of AMERICAN.

A111. Paragraph 111 of the Complaint states legal conclusions, to which no response is required; to the extent a response is required, the allegations of Paragraph 111 are denied.

C112. HELD did not intend that his political speech be republished within the work environment of AMERICAN.

A112. The APA denies the allegations of Paragraph 112, which are contradicted by the text of the C&R posting in question.

C113. HELD did not republish his political speech within the work environment of AMERICAN.

A113. The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 113 of the Complaint and therefore denies those allegations.

C114. HELD received notice of suspension of his employment on February 8, 2005[8] under circumstances that immediately presented several strong indications that there was an improper political motive and inappropriate coordination and communication between AMERICAN and APA behind the purported justification for suspension. [Footnote 8 See, Exhibit 2, letter of Suspension, dated February 3, 2005]

A114. The APA admits that a notice of suspension of Held was issued on February 3, 2003, as alleged in Paragraph 114 of the Complaint and accompanying Footnote 8. The APA lacks information sufficient to form a belief as to the truth of the allegation as to when he received the letter and therefore

denies that allegation.  The APA denies the remaining allegations of Paragraph

114.

C115.  On August 1, 2005 at the System Board of Adjustment[9] hearing that was convened after HELD had been terminated, JIRSCHELE testified under oath that a "line pilot, non-management pilot" had called him on his cellular telephone on or about January 30, 2005 to complain about HELD's January 22, 2005 C&R post.[10]  [Footnote 9 AMERICAN and APA subsequently appointed a System Board of Adjustment on this matter under the provisions of the RLA (45 U.S.C. § 184) and Section 23 of the Contract. See, Exhibit 10, *Section 23*. Footnote 10 At all times, AMERICAN has refused to identify this alleged complainant or provide undredacted copies of the complaint documents as explicitly required under Section 21.8.4. of the Contract. See, Exhibit 9, *Section 21*.]

A115.  The APA admits the allegations of Paragraph 115 of the

Complaint.  The APA admits the allegation of accompanying Footnote 9 that a

System Board was appointed and accompanying Footnote 10 that American

refused to identify the Complainant or provide unredacted copies of certain

documents.  The remaining allegations of Footnotes 9 and 10 constitute legal

conclusions and require no response; to the extent a response is required, those

allegations are denied.

C116.  JIRSCHELE provided a redacted facsimile he received after the call on January 30, 2005 from the individual who allegedly called him to complain.

A116.  The APA admits the allegations of Paragraph 116 of the

Complaint.

C117.  JIRSCHELE testified that the facsimile from the complaining pilot ("the Plain Text Fax") was not recognizable to him as a C&R post, so he called the pilot back and asked him for something that looked more like a normal C&R post.

A117.  The testimony referenced in Paragraph 117 of the Complaint is contained in Ex. 5 to the Complaint and speaks for itself.  Therefore the APA denies the allegations of Paragraph 117 attempting to characterize that testimony. The APA admits the remaining allegations of Paragraph 117.

C118.  On information and belief, APA's past practice has been to deny authority to access C&R to Executive Members of APA such as JIRSCHELE and all management pilots for AMERICAN.

A118.  The APA admits the allegations of Paragraph 118 of the Complaint except as to the use of the term "management pilots," which is too vague and ambiguous to admit or deny; accordingly, the APA must be deemed to deny that particular allegation.

C119.  JIRSCHELE testified that he knew what a C&R post looked like because, he said, "Pilots have over the years given me copies of C&R postings."

A119.  The APA admits the allegations of Paragraph 119 of the Complaint.

C120.  During the course of a meeting on March 1, 2005, discussed in paragraphs 148 through 155 below, JIRSCHELE stated "I have checked also and see that the content [of the Plain Text Fax] appears to be the same [as what was on C&R] so near as 1 can tell."

A120.  The APA admits the allegations of Paragraph 120 of the Complaint.

C121.  During the direct examination of HELD at the System Board Hearing on August 3, 2005, counsel for AMERICAN, RJ Hendricks, objected to a question about AMERICAN monitoring C&R, "There's no evidence that the company monitors C&R."

A121.  The APA admits the allegations of Paragraph 121 of the Complaint.

C122.  Despite denying HELD the right to confront his alleged accuser and examine the sincerity, purpose, and method of the alleged complaint, the System Board

arbitrator concluded in his decision that "[t]his was not an attempt by the Company to monitor C&R content." The arbitrator made this statement to justify the decision to sustain the termination of HELD because this case was different from another case[11] in which it was shown that an employer had gained unauthorized access to, and monitored, a web site operated by union activists and, therefore, the employer had engaged in unlawful conduct. [Footnote 11 See, *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (2002)]

A122. The APA admits that the System Board issued a written decision on the Held grievance, which speaks for itself. The APA denies the allegations of Paragraph 122 of the Complaint and accompanying Footnote 11, which attempt to characterize the substance of that decision.

C123. On information and belief, AMERICAN solicits and receives from selected union members who are sympathetic to management such C&R posts that the union members feel would be of interest to the management of AMERICAN.

A123. The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 123 of the Complaint and therefore denies those allegations.

C124. In 1997, the AMERICAN Vice President of Flight, Cecil Ewell, contacted HELD by phone early one morning to complain about one of HELD's posts to C&R.

A124. The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 124 of the Complaint and therefore denies those allegations.

C125. On information and belief, AMERICAN has contacted other pilots regarding their posts to C&R.

A125. The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 125 of the Complaint and therefore denies those allegations.

C126.  On information and belief, ORD Chief Pilot John Burton accessed the APA web site in the two weeks prior to HELD being notified he was suspended on February 8, 2005.

A126.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 126 of the Complaint and therefore denies those allegations.

C127.  On information and belief, ORD Chief Pilot John Burton monitored and acquired contents from the APA web site.

A127.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 127 of the Complaint and therefore denies those allegations.

C128.  On information and belief, ORD Chief Pilot John Burton's unauthorized purpose was to gather information for use in disciplining HELD and, possibly, other APA members.

A128.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 128 of the Complaint and therefore denies those allegations.

C129.  In a voicemail left for HELD on his cell phone in late January 2005 from APA Communications Committee Chairman Denis Breslin ("Breslin"), APA notified HELD that an individual had attempted to forward HELD's January 22, 2005 C&R post directly to management personnel at AMERICAN but that the attempt failed and APA received a "bounce" message that might be of interest to HELD.

A129.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 129 of the Complaint and therefore denies those allegations.

C130.  In March 2005, after HELD had received the old voicemail and sought to follow up on this information, APA refused to provide HELD with any relevant information about this "bounce" including the date and time of the transmission attempt,

the identity and location of the individual initiating it, and the intended recipient at AMERICAN.

A130.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 130 of the Complaint and therefore denies those allegations.

C131.  On information and belief APA knows who was attempting to forward HELD's January 22, 2005 C&R post to AMERICAN.

A131.  The APA denies the allegations of Paragraph 131 of the Complaint.

C132.  On information and belief, the evidence of routine transmittal of C&R posts to AMERICAN and contact of union members about their C&R posts by AMERICAN indicates the presence of a systemic practice of monitoring of C&R by AMERICAN.

A132.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 132 of the Complaint and therefore denies those allegations.

C133.  On information and belief, AMERICAN communicated with SOVICH, CONDES, REEDY, and/or APA to have REEDY make a complaint to give AMERICAN pretext to investigate and terminate the employment of a union activist.

A133.  The APA denies the allegations of Paragraph 133 of the Complaint as they concern the APA, Sovich and Condes.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 133 as they concern Reedy and therefore denies those allegations.

C134.  JIRSCHELE testified that he received a "second document" from the complaining pilot within two days.

A134.  The APA admits the allegations of Paragraph 134 of the Complaint.

C135.  The second document JIRSCHELE received was the web page version of an official union communication that SOVICH had sent via e-mail to the members of APA BOS on January 31, 2005.

A135.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 135 of the Complaint and therefore denies those allegations.

C136.  This so-called mass e-mail "blast" to the APA BOS members from SOVICH carried the subject, "Policing our own."

A136.  The APA admits that Sovich distributed an email to APA BOS members titled "Policing Our Own," but denies the remaining allegations of Paragraph 136 of the Complaint.  The Sovich email is attached as part of Exhibit 1 of the Complaint and speaks for itself.

C137.  In accordance with APA's practices, all such official communications to the members of one APA domicile are also immediately available for viewing on the APA web site to all members of APA – and, unlike C&R posts such as HELD's – such blasts are available for viewing and printing within AMERICAN's workplace.

A137.  The APA denies the allegation of Paragraph 137 of the Complaint regarding "APA practices," but admits the remaining allegations of Paragraph 137.

C138.  In his January 31, 2005 "Policing our own" blast, SOVICH personally attacked HELD for his union political activity.

A138.  The APA denies the allegations of Paragraph 138 of the Complaint.

C139.  In his January 31, 2005 "Policing our own" blast, SOVICH republished similar negative views about HELD from a candidate for union office at the APA Los Angeles Domicile.

A139. The APA admits that "Policing our Own" republished a negative view of Held's January 22, 2005, C&R posting but denies the remaining allegations of Paragraph 139 of the Complaint.

C140. The "Policing our own" blast also contained a complete "copy/paste" visually and editorially verbatim replica of HELD's January 22, 2005 C&R post.

A140. The APA admits that "Policing our own" contained as an attachment a copy of Held's January 22, 2005, posting as it appeared on C&R. Due to the vagueness of the terminology in Paragraph 140 of the Complaint, the APA can neither admit nor deny the accuracy of the Paragraph's attempt to characterize that copy and therefore denies those allegations.

C141. Union members can use AMERICAN's computers at work to read and display all official APA communications such as the Sovich "Policing our own" blast which contained HELD's January 22, 2005 C&R post.

A141. The APA admits the allegations of Paragraph 141 of the Complaint.

C142. Any AMERICAN employee could have thus viewed and read HELD's January 22, 2005 C&R post at the workplace by looking at the screen when an APA member was viewing SOVICH's "Policing our own" blast.

A142. The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 142 of the Complaint and therefore denies those allegations.

C143. During the System Board Hearing testimony of JIRSCHELE, counsel for AMERICAN, RJ Hendricks, stated that it was "the Company's position that [the Plain Text Fax came] from a pilot who observed the posting on C&R, not from a pilot observing Captain Sovich's posting, copying something from that, and then sending it to Captain Jirschele."[12] [Footnote 12 See, Exhibit 5, System Board Hearing transcript, at page 137.]

A143. The APA admits the allegations of Paragraph 143 of the Complaint and accompanying Footnote 12.

C144.  JIRSCHELE testified that, after receipt of the Plain Text Fax, he made contact within management of AMERICAN and an unspecified official of APA and initiated the process leading to suspension of HELD's employment with AMERICAN.

A144.  The AA denies that Jirschele's contact with an APA official was part of the process "leading to the suspension of Held's employment with American" but admits the remaining allegations of Paragraph 144 of the Complaint.

C145.  On February 8, 2005, HELD received a facsimile letter dated February 3, 2005 notifying him that his employment was suspended pending investigation into the two documents that JIRSCHELE stated he had received.

A145.  The APA lacks information sufficient to form a belief as to the truth of the allegation in Paragraph 145 of the Complaint concerning when Held received Jirschele's February 3, 2005, letter, which speaks for itself.  The APA admits that Jirschele sent the letter dated February 3, 2005, but denies the allegations of Paragraph 145 attempting to character the substance of the letter.

C146.  Included with the February 8, 2005, facsimile were seven additional pages including the two documents purporting to support the basis of suspension and investigation (the Plain Text Fax and a three-page printout from the APA web site of the "Policing our own" blast of SOVICH).

A146.  The APA admits that Jirschele's February 3, letter contained seven pages of attachments, all of which speak for themselves.  The APA denies the allegations of Paragraph 146 attempting to characterize the substance of those documents.

C147.  Realizing that AMERICAN believed the mere use of words on the page constituted speech in violation of company rules regardless of political context, and realizing that although HELD had not engaged in or published such speech in the work environment – but also recognizing that SOVICH had published such speech in the work environment – HELD initiated a test of AMERICAN's parity by making his own "Rule 32 complaint" to AMERICAN on February 10, 2005 regarding the actions of SOVICH.[13]
[Footnote 13 See, paragraphs 399 through 401 for outcome of HELD's February 10,2005 complaint.]

A147.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 147 of the Complaint and accompanying Footnote 13 and therefore denies those allegations.

C148.  On March 1, 2005, HELD attended a hearing convened by JIRSCHELE on behalf of AMERICAN regarding the alleged complaint.

A148.  The APA admits the allegation of Paragraph 148 of the Complaint that Held attended a hearing convened by Jirschele on March 1, 2005, but cannot discern what is meant by the term "alleged complaint" and therefore denies that allegation.

C149.  A transcript of the meeting was taken at HELD's request and expense.[14]
[Footnote 14 See, Exhibit 3, March 1, 2005 hearing transcript.]

A149.  The APA admits the allegations of Paragraph 149 of the Complaint and accompanying Footnote 14.

C150.  During this hearing, JIRSCHELE explained that the first document from the alleged complainant did not look like a C&R post and had a different font than C&R.

A150.  The APA admits that, during the hearing, Jirschele made certain comments concerning documents, and that the transcript speaks for itself on these matters.  The APA denies the allegations of Paragraph 150 of the Complaint that attempt to characterize the Jirschele statements contained in the transcript.

C151.  JIRSCHELE stated his "presumption is that the person who reported to [him] cut it from a C&R post and then put it into a Word document so the format changed."[15]  [Footnote 15 Id, at page 7:14-17.]

A151.  The APA admits the allegations of Paragraph 151 of the Complaint and accompanying Footnote 14.

C152.  In attendance at this March 1, 2005 hearing was another Chief Pilot, Steve Allen, Counsel for APA, Richard Moyed ("Moyed"), the APA ORD Chairman, Ron Hunt, and at HELD's request for help with representation, a fellow APA member, Mark Hunnibell ("Hunnibell").

A152. The APA admits the allegations of Paragraph 152 of the

Complaint.

C153. JIRSCHELE's "investigation" consisted of seeking an answer from HELD as to only one issue: Did HELD make this post?

A153. The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 153 of the Complaint and therefore denies

those allegations. The APA would further state that Jirshele's testimony at the

System Board hearing, a transcript of which is attached to the Complaint as

Exhibit 5, indicates that his "investigation" was broader than that alleged in

Paragraph 153.

C154. Moyed and Hunnibell each attempted to explain to JlRSCHELE that C&R was a union-operated statutorily- and federally-protected union hall function that also had no lawful workplace nexus and proffered arbitral citation for these conclusions.

A154. The APA admits that Moyed and Hunnibell made statements in

support of Held to Jirschele and that the items referenced in Paragraph 154 of the

Complaint were part, but not all, of the matters they addressed. The APA denies

the allegations of Paragraph 154 that attempt to characterize the substance of

those statements, which are included in the transcript of the hearing (see Exhibit 3

to the Complaint) and speak for themselves.

C155. Moyed and Hunnibell each clearly stated that it was impermissible for the employer to invade the union hall to punish union members engaged in protected political speech critical of union officials.

A155. The APA admits that Moyed and Hunnibell made statements,

which speak for themselves, but denies the allegations of Paragraph 155 seeking

to characterize the substance of those statements.

C156.   On April 4, 2005, HELD was again summoned to the ORD Flight Office. Present at this meeting was HELD, Hunnibell, JIRSCHELE, and both APA ORD union officers, APA ORD Domicile Chairman Ron Hunt and APA ORD Domicile Vice Chairman CONDES.  Moyed participated remotely via speaker telephone.

A156.  The APA denies the allegation of Paragraph 156 of the Complaint that Held was "again" summoned to Jirschele's office but admits the remaining allegations of Paragraph 156.

C157.  At the April 4, 2005 meeting, JIRSCHELE personally read a letter to HELD in which he stated that HELD was terminated for the sole reason that, in his January 22, 2005 C&R post, HELD had directed speech to a union official, Weller, and that speech, made entirely within the union hall, was a violation of the WEP within Rule 32.

A157.  The APA admits that Jirschele read a letter of termination at the April 4, 2005, meeting, which speaks for itself.  See Exhibit 1 to the Complaint. The APA denies the remaining allegations of Paragraph 157 of the Complaint, which attempt to characterize the substance of that letter.

C158.  JIRSCHELE reported AMERICAN's conclusion that HELD had directed hate-related speech to one employee in violation of AMERICAN's Rules of Conduct.

A158.  The APA denies the allegations of Paragraph 158 of the Complaint in that they attempt to characterize the text of the termination letter.

C159.  After reading the letter, JIRSCHELE asked if there were any questions.

A159.  The APA admits the allegations of Paragraph 159 of the Complaint.

C160.  Moyed asked three questions seeking to: (a) know who made the termination decision, (b) confirm the sole reason for termination was the single C&R post, and (c) obtain an explanation of the conclusion that HELD's C&R post constituted a violation of the "hate-related" portion of the employer's Workplace Environment Policy.

A160.  The APA admits the allegations of Paragraph 160 of the

Complaint.

C161.  In the week prior to any admitted action by AMERICAN against HELD, members of the APA BOD and National Officers began and engaged in discussion via group e-mail concerning HELD's January 22, 2005 C&R post in which some discussed their desire to discipline HELD and the limitations preventing them from doing so ("the BOD E-Mail List Discussion").

A161.  The APA admits that there was email discussion among APA

Board Members and National Officers concerning Held's January 22, 2005, C&R

posting, which emails speak for themselves.  The APA denies the allegations of

Paragraph 161 of the Complaint that attempt to characterize the substance of

those emails and denies the allegation concerning "admitted action by American

against Held" because it is unclear what "admitted action" means.

C162.  Some of the sending and receiving participants in the BOD E-Mail List Discussion and other union officials were political adversaries of HELD as described in paragraphs 252 through 288 of this Complaint.[16]  [Footnote 16 See Complaint subsection titled, *Political History Between Held, Sovich, Reedy, and APA*]

A162.  Because of the vagueness of the term "political adversaries," the

APA must deny the allegations of Paragraph 162 of the Complaint and

accompanying Footnote 16.

C163.  Many of the participants in the BOD E-Mail List Discussion considered HELD their political adversary.

A163.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 163 of the Complaint and therefore denies

those allegations.

C164.  The BOD E-Mail List Discussion began on January 24, 2005, when APA DFW Vice Chairman Mickey Mellerski ("Mellerski") reported that one member had contacted him to inquire what – if anything – APA intended to do to discipline HELD for the manner in which HELD expressed his views about a union official in his C&R post.

A164.  The APA admits that Dallas-Ft. Worth Vice Chairman Mellerski

sent an email on January 24, 2005, on the subject of a member contact, which

email speaks for itself.  The APA denies the allegations of Paragraph 164 of the

Complaint that attempt to characterize the substance of that email.  The APA

lacks information sufficient to form a belief as to the truth of the allegation that

Mellerski's email "began" the so called E-mail List Discussion and therefore

denies that allegation.

C165.  Early in the discussion, several members of the APA BOD expressed or
implied the view that APA policies or the LMRDA proscriptions against disciplining
members engaged in free speech under the union members' bill of rights effectively
prevented APA from disciplining HELD for his C&R post.

A165.  The APA admits that certain emails were exchanged among BOD

members regarding Held's C&R posting, which speak for themselves.  The APA

denies the allegations of Paragraph 165 of the Complaint attempting to

characterize the substance of those emails.

C166.  In a January 25, 2005 message in the BOD E-Mail List Discussion,
SOVICH advocated expulsion from the union for HELD.

A166.  The APA admits that Sovich sent an email message on January 25,

2005, which speaks for itself, and denies the allegations of Paragraph 166 of the

Complaint attempting to characterize the substance of that email.

C167.  On January 25, 2005, SOVICH wrote that the answer to the problems
APA faced in being unable to disciple HELD could be solved by HELD being disciplined
by AMERICAN.

A167.  The APA denies the allegations of Paragraph 167 of the

Complaint.

C168.  SOVICH added that, if APA was unable to expel HELD from APA, HELD's January 22, 2005 C&R post was "likely to end up" at AMERICAN and SOVICH said this would result in HELD's termination.

A168.  The APA denies the allegations of Paragraph 168 of the

Complaint.

C169.  SOVICH wrote the HELD "should be ejected from the union for this vicious, libelous, unprovoked, unprofessional despicable attack on a fellow union member.  If we cannot police our own this will end up in HR.  It is likely to anyway and will end up as a termination."

A169.  The APA admits the allegations of Paragraph 169 of the

Complaint.

C170.  On information and belief, on or about January 25, 2005, CONDES discussed HELD's January 22, 2005 C&R post with employees of the APA Legal Department at APA headquarters.

A170.  The APA admits the allegations of Paragraph 170 of the

Complaint.

C171.  Neither CONDES nor APA ever disclosed the existence and substance of that discussion to HELD.

A171.  The APA denies the allegations of Paragraph 171 of the

Complaint.

C172.  After discussing HELD's January 22, 2005 C&R post with APA Legal, CONDES left HELD a voicemail on his cell phone on Jan 25, 2005, asking HELD to call him but did not state the reason for the request.

A172.  The APA admits the allegations of Paragraph 172 of the

Complaint.

C173.  HELD returned the call to CONDES on January 26, 2005 and spoke with CONDES for approximately five minutes.

A173.  The APA admits the allegations of Paragraph 173 of the

Complaint.

C174.  On the January 26, 2005 call, without disclosing that he had already discussed the January 22, 2005 C&R post with APA Legal, CONDES made inquiry regarding HELD's purpose in making the C&R post.

A174.  The APA denies the allegation of Paragraph 174 of the Complaint that Condes did not inform Held that he had discussed the C&R post with APA Legal but admits the remaining allegations of Paragraph 174.  The APA further states that Condes recommended that Held withdraw the posting in order to avoid trouble with American, and Held informed Condes that he (Held) would sue Condes and/or the APA if his posting were removed from C&R.

C175.  HELD told CONDES that his post was to draw attention to Weller's misconduct.

A175.  The APA denies the allegations of Paragraph 175 of the Complaint.

C176.  Five days after the BOD E-Mail List Discussion began, on January 29, 2005, the Chairman of the Saint Louis Domicile, Douglas Gabel ("Gabel"), wrote that he was "pleased to see" that his routine "Saturday mailing" of materials from APA headquarters contained a "poster size" version of HELD's January 22, 2005 C&R post and suggested that "maybe we should post it on the [union bulletin boards in the workplace of AMERICAN] this week and see what happens."

A176.  The APA admits that the words quoted in Paragraph 176 of the Complaint appear in St. Louis Domicile Chairman Gabel's January 29, 2005, but denies the allegations of Paragraph 176 attempting to characterize the substance of that email by selectively quoting from it.

C177.  The union bulletin board space described by Gabel is provided in AMERICAN's workplace by AMERICAN for APA use in accordance with the provisions of Section 24.A. of the Contract.[17]  [Footnote 17 See, Exhibit 11, *Section 24.*]

A177.  The APA admits the allegation of Paragraph 177 of the Complaint and accompanying Footnote 17.

C178.  The "poster size" document (the "Rob Held Please Post") to which Gabel referred bears conspicuous formatting similarity to The Plain Text Fax.

A178.  Because of the vagueness of the term "conspicuous formatting similarity," the APA cannot admit or deny allegations of Paragraph 178 of the Complaint and therefore must be deemed to deny them.

C179.  The Rob Held Please Post was produced in the same non-C&R font[18] as the Plain Text Fax and also had none of the standard formatting of a C&R posting.
[Footnote 18 Times Roman]

A179.  Because of the vagueness of their operative terms, the APA denies the allegations of Paragraph 179 of the Complaint and accompanying Footnote 18.  The APA further states that the "Please Post" was never posted on any union bulletin board.

C180.  In a BOD E-Mail List Discussion e-mail on January 29, 2005, Mellerski expressed his view that it was a mistake to create the Rob Held Please Post because, "putting it in the BOD packets without explanation implies it should be posted, which is the reason it is in [there] in the first place, because at least one BOD member fully intends to post it and asked that it be included in the packets."

A180.  The APA admits that the language quoted in Paragraph 180 of the Complaint appears in Mellerski's January 29, 2005, email, which speaks for itself, but denies the remaining allegations of Paragraph 180 which attempt to characterize the substance of the email.

C181.  SOVICH replied to Mellerski in 30 minutes and stated his intention to post the Rob Held Please Post on the bulletin board in the workplace of AMERICAN: "I completely disagree.  We don't demean ourselves.  Others demean our profession and THEMSELVES.  It will be posted in BOS."

A181.  The APA admits that the language quoted in Paragraph 181 of the Complaint appears in a January 29, 2005, Sovich email, which speaks for itself, but denies the remaining allegations of Paragraph 181 in that they attempt to characterize the substance of the email.

C182.   In reply to SOVICH, Gabel pointed out that the person who put it in the workplace would likely be held liable for putting it there, not the author: "Adolph Hitler and I am sure many white supremacy leaders out there have written some dandy stuff.  If I post those who would be guilty of spreading hate in the company and thus be accused of rule 32?  I would bet it would be me since I was the one spreading it and yet I would only be reposting something the original author wanted to be posted. I think the same holds in this case.  Rob Held might have said it but the act of posting makes the poster complicit."

A182.   The APA admits that Gabel wrote an email containing the language quoted in Paragraph 182 of the Complaint, which speaks for itself.  The APA denies the remaining allegations of Paragraph 182 in that they attempt to characterize the substance of that email.

C183.   On January 29, 2005, Gabel also wrote, "If Rob Held gets fired I will not shed one tear."

A183.   The APA admits the allegations of Paragraph 183 of the Complaint.

C184.   DCA Chairman Gary Boettcher ("Boettcher") replied to Gabel and expressed his view that APA had no obligation to HELD at all: "We owe the profession and the pilots as a group... we owe nothing to an individual pilot."

A184.   The APA admits that DCA Chair Boettcher wrote an email containing the language quoted in Paragraph 184 of the Complaint, which speaks for itself.  The APA denies the remaining allegations of Paragraph 184 because they attempt to characterize the substance of that email.

C185.   On January 30, 2005, SOVICH replied to Gabel: "If Adolph Hitler had written it and authorized me to use it any way I saw fit, I'd post his stuff too."

A185.   The APA admits the allegations of Paragraph 185 of the Complaint.

C186.   After it was disclosed to the APA BOD that SOVICH had sent his "Policing our own" blast, on January 31, 2005, Boettcher sent an e-mail to the other APA BOD members in which he disclosed that he knew the company had already received a

complaint about HELD and added further commentary suggesting it would be appropriate for the Federal Aviation Administration to suspend HELD's pilot licenses.

A186.  The APA admits that Boettcher sent an email on January 31, 2005, which speaks for itself.  The APA denies that Boettcher's email came after Sovich's "Policing our own" document was distributed to the APA Board and denies the remaining allegations of Paragraph 186 of the Complaint in that they attempt to characterize the substance of the Boettcher email.

C187.  In an e-mail to the APA BOD on January 31, 2005, Mellerski said he had seen no interest from the membership for HELD to be disciplined by APA.  Mellerski stated that he had only received an inquiry from one member.  Mellerski said that the only other member to make input was the individual that wrote to APA and SOVICH had included in his "Policing our own" blast.  Mellerski said that the only ones who cared about punishing HELD were "us," meaning the APA BOD.

A187.  The APA admits that Mellerski sent an email to the APA BOD on January 31, 2005, which speaks for itself.  The APA denies the remaining allegations of Paragraph 187 of the Complaint because they attempt to characterize the substance of that email.

C188.  After discovering the Rob Held Please Post had been produced and distributed by officials of his own union with the obvious purpose to jeopardize his employment, HELD requested that APA explain who ordered its production and distribution.

A188.  The APA denies that the Please Post was "distributed" and the allegations in Paragraph 188 of the Complaint concerning the APA's purpose. The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 188 and therefore denies those allegations.

C189.  Initially, APA ignored this request, but APA eventually stated that they could not determine who ordered production and authorized distribution of the Rob Held Please Post.

A189.  The APA denies the allegations of Paragraph 189 of the Complaint

and further states that the "Please Post" was never posted on any union bulletin

board.

C190.  In spite of alleging they did not know its source, or the authority for its
distribution, APA claimed the Rob Held Please Post had only been distributed to the
elected officers (21 union officials) and not to the approximately 100 other union
officials who receive such weekly packages from APA headquarters.

A190.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 190 of the Complaint and therefore denies

those allegations.

C191.  Beginning on February 8, 2005, as the events described in paragraphs 114
through 147 occurred, HELD sought counsel, representation, and information from APA
in order to aggressively defend himself against the allegation that, by his January 22,
2005 C&R post, he had violated AMERICAN's Rules of Conduct.

A191.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 191 of the Complaint and therefore denies

those allegations.

C192.  HELD made a number of requests of APA and its officers and agents for
support, information, and documents that were reasonably calculated to provide adequate
resources and evidence to defend HELD against potential discipline by AMERICAN.

A192.  The APA admits that Held made certain requests of the APA but

denies the remaining allegations of Paragraph 192 of the Complaint

C193.  HELD's requests, in addition to being motivated by his self-interest in
preserving his career as a pilot, were further influenced by his belief (shared by many
others, including some union officials) that discipline of a union member by
AMERICAN for engaging in activity explicitly protected by federal statute would cause
damage to the institutional interests of APA.  Specifically, HELD was concerned about
the APA's ability to remain a viable labor union that was not illegally controlled,
influenced, or constrained by rules of an employer.

A193.  The APA denies the allegations of Paragraph 193 of the Complaint other than the allegation that Held was acting in his own self-interest, which the APA admits.

C194.  The majority of these requests by HELD were denied or ignored.

A194.  The APA denies the allegations of Paragraph 194 of the Complaint.

C195.  When there was eventual compliance on some issues by APA, lack of timeliness was a major problem.

A195.  The APA denies the allegations of Paragraph 195 of the Complaint.

C196.  The responses by APA were, in some cases, incomplete and inaccurate.

A196.  The APA denies the allegations of Paragraph 196 of the Complaint.

C197.  On February 10, 2005, APA reported to the membership on its "Information Hotline" that the APA BOD met "for a discussion with General Counsel concerning potential changes to the Association's electronic media use policy."

A197.  The APA admits the allegations of Paragraph 197 of the Complaint.

C198.  On information and belief, the "potential changes" being discussed were contained within APA BOD resolutions R2004-96 and R2004-97, legislation then being proposed by SOVICH.

A198.  The APA admits the existence of the two proposed BOD resolutions cited in Paragraph 198 of the Complaint, that they were proposed by Sovich and that they concerned modifications to the Acceptable Use Policy for APA's website and its subparts.  The APA denies the remaining allegations of Paragraph 198.

C199.  On February 26, 2005, HELD filed an internal complaint with APA alleging that SOVICH had violated Article VII of the APA's Constitution and Bylaws by, among other things, jeopardizing HELD's employment by publishing a document into the workplace which was used as evidence to initiate and support discipline by AMERICAN ("the Article VII Complaint").[19]  [Footnote 19 <u>See</u>, paragraphs 376 through 397 regarding the disposition of this Article VII complaint.]

A199.  The APA admits that Held filed an internal complaint concerning Sovich as alleged in Paragraph 199 of the Complaint and accompanying Footnote 19, and the APA admits that Held advanced certain grounds for the charges.  The APA denies that those charges had any factual or legal substance.

C200.  After the March 1, 2005 hearing, HELD became increasingly concerned that, if he was successfully disciplined for his non-threatening, political comments made in the union hall, such action would cause other union members to discontinue, restrict, or alter their participation in the union for fear of discipline by AMERICAN and this would therefore be a fundamental blow to the function of the union and the collective bargaining agreement itself.

A200.  The APA denies the allegations of Paragraph 200 of the Complaint but would state that Held also became concerned, belatedly, that he personally would suffer penalties for his C&R posting, including its open invitation that readers retransmit the posting as they saw fit.

C201.  Based on HELD's concerns about the pending precedent of AMERICAN interfering in APA affairs, HELD sought representation from the APA General Counsel firm due to these important institutional interests.

A201.  The APA admits that Held sought assistance from the APA General Counsel Firm to help him defend himself against potential penalties for his actions but denies the remaining allegations of Paragraph 201 of the Complaint and denies that Held had any right or entitlement to personal representation by the APA General Counsel Firm, which was counsel to the APA itself rather than to any individual member of the APA.

C202.  The President of APA denied this request.

A202.  The APA admits the allegations of Paragraph 202 of the Complaint that its President denied Held's request for personal representation by the APA General Counsel Firm.  The APA further states that the APA General Counsel Firm provided valuable service to Held's defense in the person of Kathy L. Krieger, Esq., who served as one of the APA's two representatives on the System Board of Adjustment panel that ultimately heard and decided Held's grievance over his termination.  Further, Held never attempted personally to retain the APA General Counsel Firm to serve as his personal representative.

C203.  On or about April 7, 2005, APA appointed Tricia Kennedy (hereinafter "Kennedy"), an in-house attorney of APA, to "provide services" to HELD.[20]  [Footnote 20 On July 18, 2005, in an e-mail exchange regarding the draft disclosure statement, Kennedy responded to a question about who she represented:
Q: Do you not represent Rob Held and the Allied Pilots Association?
A: I represent the APA which provides services to Rob Held as the grievant/member.]

A203.  The APA admits the allegations of Paragraph 203 of the Complaint and accompanying Footnote 20 and further states that the assignment of a member of the APA's in-house legal staff was perfectly consistent with the procedure applied by the APA to other member grievants.  Tricia Kennedy's responses to Held's query reproduced in Footnote 20 are entirely consistent with the APA policy and with the law regarding the representational obligations of union attorneys.

C204.  By mid-February 2005, although HELD had obtained copies of a small portion of the BOD E-Mail List Discussion,[21] because APA withheld this evidence from HELD and refused to enter it in evidence, HELD could not use nor did he have copies of what he now believes to be the complete discussion record.  [Footnote 21 See, paragraphs 161 through 187.]

A204.  The APA denies the allegation in Paragraph 204 of the Complaint and accompanying Footnote 21 that it "withheld" any evidence from Held.  The

APA lacks information sufficient to form a belief as to the truth of the remaining

allegations of Paragraph 204 and therefore denies those allegations.

C205.  In July 2005, HELD provided Kennedy with copies of all BOD E-Mail List Discussion messages he had received in February 2005 in the belief they would be evidence useful for his defense.

A205.  The APA admits the allegation in Paragraph 205 of the Complaint

that Held provided certain email messages to Kennedy in July 2005 but lacks

information sufficient to form a belief as to what Held "believed" and therefore

denies that allegation.  The APA further states that in the event Held believed the

email messages would be "evidence useful for his defense," he was simply

wrong.

C206.  Kennedy refused to mark the BOD E-Mail List Discussion messages supplied by HELD as exhibits for the pending arbitration.

A206.  The APA admits that Kennedy decided not to use the email

messages referenced in Paragraph 206 of the Complaint as evidence in the

arbitration but denies the remaining allegations of Paragraph 206.

C207.  Kennedy's stated reason for excluding the BOD E-Mail List Discussion was that she did not want to present the arbitrator with evidence that the union was not backing HELD because it would make it easier for the arbitrator to decide against HELD if both AMERICAN and APA were in agreement on the termination.

A207.  The APA admits that Kennedy set forth reasons for excluding the

emails in an email, which speaks for itself.  The APA denies the remaining

allegations of Paragraph 207 of the Complaint, which attempt to characterize the

substance of that email.

C208.  Kennedy asked HELD to divulge his source for the e-mails so that she could "have a chat" with that person about disclosing those e-mails to HELD.

A208.  The APA admits the allegations of Paragraph 208 of the Complaint

and further states that Kennedy was concerned that someone had released

confidential communications among Board of Directors members.

C209.  Kennedy subsequently obtained a complete set of the BOD E-Mail List Discussion messages from APA LGA Chairman Sam Mayer, who was to be a witness at the System Board Hearing.

A209.  The APA admits the allegations of Paragraph 209 of the

Complaint.

C210.  Kennedy never disclosed to HELD that the content and scope of the BOD E-Mail List Discussion messages obtained from Mayer went substantially beyond the e-mails HELD had obtained in February 2005.

A210.  The APA admits the allegations of Paragraph 210 of the Complaint

that Kennedy did not make the referenced disclosure but denies that the

referenced disclosure is factually correct.

C211.  Kennedy never disclosed to HELD that there was strong evidence in the e-mails dated as early as January 25, 2005, that APA officers including SOVICH discussed HELD being disciplined by AMERICAN because the law or APA's policies most likely rendered APA unable to do so.

A211.  The APA admits that Kennedy never disclosed the "evidence"

described in Paragraph 211 of the Complaint but denies that there was such

"evidence" in the emails at issue.

C212.  Kennedy never disclosed to HELD that one of the BOD E-Mail List Discussion messages was from SOVICH stating that he planned to place the "Rob Held Please Post" in the workplace of AMERICAN.

A212.  The APA admits that Kennedy did not disclose the Sovich email

referenced in Paragraph 212 of the Complaint, but states that Held already knew

of that email.  See Paragraph 181 of the Complaint.  The APA denies that the

"Please Post" was ever actually placed in the workplace of American.

C213.  On information and belief, the actual reason that Kennedy did not want to mark the BOD E-Mail List Discussion messages for exhibit is that she and SOVICH had already discovered and discussed the self-incriminating nature of the BOD E-Mail List Discussion messages and they did not want HELD to have such evidence for future use against APA if the need arose, as it has.

A213.  The APA denies the allegations of Paragraph 213 of the

Complaint.

C214.  Almost immediately after being notified he was suspended, HELD sought access to data from the APA internet server logs so that he could potentially identify the complainant.

A214.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 214 of the Complaint and therefore denies

those allegations.

C215.  HELD sought the identity of the complainant to discover any political connection and motives to HELD that would provide evidence that the motives of the complainant had nothing to do with any "hate-related" sensitivities of the complainant.

A215.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 215 of the Complaint and therefore denies

those allegations.  In any case, the System Board determined that the matters

discussed in Paragraph 215 were irrelevant to a determination of whether Held

violated American's Rule 32 and its Work Environment Policy.

C216.  APA repeatedly refused to provide HELD the requested data.

A216.  The APA denies the allegations of Paragraph 216 of the

Complaint.

C217.  HELD sought copies of previous arbitration decisions on Rule 32, statutory citations, and legal theories being used in a then-pending arbitration case regarding another pilot who was disciplined under Rule 32 for a single C&R post.

A217.  The APA admits the allegations of Paragraph 217 of the

Complaint.

C218.  APA eventually provided some of the requested decisions, but consistently refused to provide any statutory citations and legal theories that HELD could have reviewed and used to mount and participate in his effective defense.

A218.  The APA admits that it furnished arbitral decisions requested by

Held, which themselves contained legal citations and theories and denies the

remaining allegations of Paragraph 218 of the Complaint.

C219.  During a telephone conference call with HELD on July 10, 2005, Kennedy said she was present at the Arpey Meeting.[22]  [Footnote 22 See, paragraph 48 for discussion of the Arpey Meeting.]

A219.  The APA admits the allegations of Paragraph 219 of the

Complaint.

C220.  Kennedy, referring to unspecified agreements on confidentiality, (a) refused to disclose whether she took notes, and (b) refused to disclose whether anyone else took notes, and (c) refused to investigate whether notes existed, and (d) refused to investigate what the company said.

A220.  The APA denies the allegations of Paragraph 220 of the

Complaint.

C221.  When questioned further, Kennedy said she had no actual knowledge of any confidentiality agreements regarding the Arpey Meeting and that she did not review the confidentiality agreements of the officials of APA.

A221.  The APA denies the allegations of Paragraph 221 of the

Complaint.

C222.  Kennedy stated that she did not know who reviewed confidentiality agreements or if APA's practice was to have outside counsel review such agreements.

A222.  The APA admits the allegations of Paragraph 222 of the

Complaint.

C223.  In a July 18, 2005 e-mail to Kennedy, HELD reiterated his request for testimony from a witness regarding the Arpey Meeting, "We need someone's oral

recollections of Arpey or Gary Kennedy's position with respect to Rule 32 on off duty conduct at the meeting with the APA BOD in which [Kennedy] was present."

A223.  The APA admits that Held's July 18, 2005, email to Kennedy contained the language quoted in Paragraph 223 of the Complaint but denies the remaining allegations of Paragraph 223.

C224.  A week later, on July 25, 2005, Kennedy replied, saying, "As I have told you before, we will not be using oral recollections of the Exec Session with Arpey because that would breach the agreement in place when the discussions took place."

A224.  The APA admits that Kennedy's July 25, 2005, email to Held contains the language quoted in Paragraph 224 of the Complaint, as well as other language.

C225.  On information and belief, after termination and prior to the System Board Hearing, counsel for APA (Kennedy) had private communications with SOVICH during which she discussed details of AMERICAN's case against HELD.

A225.  The APA admits the allegations of Paragraph 225 of the Complaint and further states that such communications were necessary to the defense of Held.

C226.  At no time did Kennedy ever disclose to HELD her intent to discuss the case with SOVICH.

A226.  The APA denies the allegations of Paragraph 226 of the Complaint.

C227.  Kennedy has never disclosed to HELD the substance or dates of such communications with SOVICH.

A227.  The APA denies the allegations of Paragraph 227 of the Complaint.

C228.  At noon on July 18, 2005, the deadline date for witness disclosure to AMERICAN, Kennedy notified HELD that she intended to list SOVICH to be called to testify as a witness for HELD as an expert on Section 21 of the Contract.[23]  [Footnote 23 23 See, Exhibit 9, *Section 21*.]

A228.  The APA denies that July 18, 2005, was "the deadline date for witness disclosure to American" but admits the remaining allegations of Paragraph 228 of the Complaint and accompanying Footnote 23.

C229.  HELD immediately and strenuously objected to using SOVICH as a witness for a number of reasons.

A229.  The APA admits the allegations of Paragraph 229 of the Complaint.

C230.  Later that afternoon, Kennedy proposed alternative Section 21 witnesses, APA members Tom Westbrook and Scott Gounaud.

A230.  The APA admits the allegations of Paragraph 230 of the Complaint.

C231.  However, neither of the proposed witnesses were "experts" on the negotiating history and intent of the parties regarding language in Section 21.  On July 24, 2005, Kennedy finally did ask an expert on the subject, former Negotiating Committee member Lloyd Hill ("Hill") to testify.

A231.  The APA denies the allegations of Paragraph 231 of the Complaint.

C232.  However, Hill was not available to testify because the notice was too short to allow him to change a previously-planned family vacation that directly conflicted with the intended dates of testimony.

A232.  The APA denies the allegations of Paragraph 232 of the Complaint.  As Hill declared in writing to Held and others, he did not believe that the Held case had "anything to do with Section 21 of the CBA."

C233.  As a result of Kennedy's concealment of her intent to use SOVICH as a witness until after it was too late to schedule a viable alternate witness, HELD was forced to agree with APA's conclusion that testimony and arguments regarding Section 21 abuses could not be effectively prepared and advanced at the arbitration hearing.

A233.  The APA denies the allegations of Paragraph 233 of the

Complaint.

C234.  An additional factor in being unable to pursue arguments regarding
Section 21 was the unchallenged and prejudicial decision by the arbitrator that
AMERICAN did not need to comply with the provisions of Section 21.B.4.[24]  [Footnote 24
See, Exhibit 9, *Section 21.B.4*. "[T]he Company may redact names and other personal identifiers at the
preliminary investigative proceeding. It is understood that should the matter proceed to the System Board,
the Company will provide the Association such statements without redactions."]

A234.  The APA admits that the arbitrator decided that Article 21 and the

identity of the pilot who provided Held's C&R posting were irrelevant to the

determination of the Held grievance.  The APA admits that the arbitrator's

decision on this matter was "unchallenged" in the sense that the System Board

process makes no provisions for an appeal of a System Board decision.  The APA

admits the arbitrator's decision on the Section 21 issue was "prejudicial" but only

in the sense that it was a decision against Held's position.  The APA denies the

remaining allegations of Paragraph 234 of the Complaint and the accompanying

Footnote 24, but admits that Footnote accurately quotes language contained in Ex.

4, Section 21.B.4.

C235.  On March 22, 2006, APA President Ralph Hunter sent all APA members
an e-mail blast in which he misled the membership regarding HELD's involvement in the
inability to pursue Section 21 arguments when he said that a "Section 21 argument was
not presented per the grievant's request not to pursue that defense."

A235.  The APA admits that President Hunter issued an email regarding

Rule 32 on March 22, 2006, containing the quoted language, but denies the

remaining allegations of Paragraph 235 of the Complaint.

C236.  On or about July 21, 2005, approximately 10 days before the System
Board Hearing was to convene, during preparation at APA headquarters for the Hearing,
Kennedy entered her office and closed the door and reported to HELD and Hunnibell,
that APA's Director of Legal, Ray Duke ("Duke"), had just received a telephone call
from a member who identified himself to Duke and expressed concern that he would be

called as a witness due to his role in events leading to the suspension and eventual termination of HELD.

A236.  The APA denies the allegations of Paragraph 236 of the Complaint.

C237.  Kennedy stated that Duke believed the individual who called him was the unknown complainant whose identity and testimony had been previously sought by APA's own motion before the arbitrator and the arbitrator had yet to rule on the motion.[25]
[Footnote 25 APA moved for and requested enforcement of a "John Doe subpoena" in a letter to the arbitrator from July 14,2005.]

A237.  The APA admits the allegation in Paragraph 237 of the Complaint and accompanying Footnote 25 that the APA sought a "John Doe" subpoena from the arbitrator, *inter alia*, to learn the identity of the person who had provided Held's C&R posting to Jirschele but the arbitrator denied the motion and subsequently ruled that the identity and testimony of the transmitter was irrelevant.  The APA denies the remaining allegations of Paragraph 237.

C238.  Kennedy further stated that Duke told her that the individual had no political history at APA.

A238.  The APA denies the allegations of Paragraph 238 of the Complaint.

C239.  Kennedy said that APA would not disclose to HELD the identity of the individual who called Duke, in spite of her July 14, 2005 letter to the arbitrator requesting that he require AMERICAN to make the same disclosure.

A239.  The APA denies the allegations of Paragraph 239 of the Complaint.

C240.   In addition to the undisclosed private communication with SOVICH, and without any prior discussion with, disclosure to, or approval from HELD, Kennedy made several other unilateral decisions to disclose and discuss the case with other APA members.

A240.  The APA admits that, consistent with her position as an APA

lawyer, Kennedy discussed the Held grievance with appropriate APA officials.

The APA denies the remaining allegations of Paragraph 240 of the Complaint.

C241.  HELD only found out about involvement of these other individuals when they appeared in the room or they were copied, without prior notice or coordination, on privileged e-mails by Kennedy.

A241.  The APA denies the allegations of Paragraph 241 of the

Complaint.

C242.  After several months of observing that APA was acting with purposes conflicting with – and sometimes directly contrary to – his own interests, on July 11, 2005, HELD retained the services of counsel, David Bodian ("Bodian") and arranged Bodian's transportation to be present prior to and during the System Board Hearing.

A242.  The APA admits that Held retained the services of David Bodian,

but lacks information sufficient to form a belief as to the truth of the allegation

that Held arranged Bodian's transportation (and therefore denies that allegation)

and denies the remaining allegations of Paragraph 242 of the Complaint.

C243.  HELD repeatedly asked Kennedy for the transcript of a previous System Board Hearing because (a) Kennedy had been involved with handling that case for APA, and (b) it was heard by the same arbitrator as would be hearing HELD's case, and (c) the union member had hired his own counsel to be his advocate at the System Board Hearing.

A243.  The APA denies that Held repeatedly asked for the referenced

transcript.  The APA lacks information sufficient to form a belief as to the truth of

the allegations of Paragraph 243 of the Complaint concerning Held's reasoning

process and therefore denies those allegations.

C244.  HELD sought the transcripts to observe how an actual System Board Hearing was conducted when the grievant was represented by his own counsel with Kennedy present as counsel for APA and chaired by the same arbitrator assigned to hear HELD's case.

A244.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 244 of the Complaint and therefore denies

those allegations.

C245.  Kennedy never provided HELD with those transcripts, or any relevant
information regarding the use of a personal counsel in such a proceeding.

A245.  The APA admits that Kennedy did not provide the transcript

referenced in Paragraph 245 of the Complaint but denies the remaining

allegations of Paragraph 245.

C246.  On the morning of July 31, 2005, HELD introduced Bodian to Kennedy as
his counsel and asked that he be treated as such.

A246.  The APA admits that Held introduced Bodian to Kennedy on July

31, 2005 -- the day before the hearing commenced -- but denies the remaining

allegations of Paragraph 246 of the Complaint.

C247.  Kennedy's reaction was to throw a temper tantrum in which she expressed
her immediate intent to "wash her hands of it" and quit the case.

A247.  The APA denies the allegations of Paragraph 247 of the

Complaint.

C248.  Bodian assured her that he did not seek to replace her as lead counsel to
defend HELD, and Kennedy then backed down from her initially confrontational posture.

A248.  The APA admits the allegations of Paragraph 248 of the Complaint

concerning Bodian and denies those concerning Kennedy.

C249.  The next day, Bodian was introduced at the System Board Hearing as "co-
counsel" with Kennedy.

A249.  The APA admits the allegations of Paragraph 249 of the

Complaint.

C250.  Bodian participated in caucus sessions and also had a small amount of participation during the System Board Hearing.

A250.  The APA denies the allegation that Bodian had only a small amount of participation in the System Board Hearing but admits the remaining allegations of Paragraph 250 of the Complaint.  The APA further states that Ex. 5 to the Complaint speaks for itself concerning Bodian's participation in the hearing.

C251.  However, Kennedy refused to allow Bodian to conduct the direct or cross-examination of any witness at the System Board Hearing.

A251.  The APA denies the allegations of Paragraph 251 of the Complaint.

C252.  The System Board heard testimony in substantial detail describing the history of political differences between HELD and SOVICH and other APA officials.[26]
[Footnote 26 See Exhibit 5, Transcript of System Board Hearing, at pages 164 through 184.]

A252.  The APA admits that the transcript of the System Board hearing referenced in Paragraph 252 of the Complaint and accompanying Footnote 26 contains certain testimony, which speaks for itself.  The APA denies the allegations of Paragraph 252 which attempt to characterize the substance of that testimony.

C253.  AMERICAN did not dispute, refute, or challenge the facts of this history during the System Board Hearing.

A253.  American's approach to the testimony referenced in Paragraph 253 of the Complaint is set forth in the transcript of the System Board hearing, attached as Ex. 5 to the Complaint, and such transcript speaks for itself.  The APA denies the allegations of Paragraph 253 attempting to characterize the substance of that transcript.

C254.  REEDY also has a substantial and relevant history of political differences between himself and HELD, as well as a history of being a staunch SOVICH supporter and political operative for SOVICH.

A254.  The APA denies the allegations of Paragraph 254 of the

Complaint.

C255.  However, no testimony on these facts was possible at the System Board Hearing because AMERICAN had purposefully refused to identify REEDY as the individual who had allegedly complained to JIRSCHELE.

A255.  The APA admits the allegation of Paragraph 255 of the Complaint

that American had declined to identify the individual who had allegedly

complained to Jirschele about Held's posting and further states that the neutral

arbitrator on two occasions ruled that such information was irrelevant to the

determination of the Held grievance.  The APA also admits that no testimony

concerning Reedy was presented at the System Board hearing.  The APA denies

the remaining allegations of Paragraph 255.

C256.  HELD was unaware until well after the System Board Hearing that the individual who allegedly complained to JIRSCHELE was REEDY.

A256.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 256 of the Complaint concerning what Held

was aware of and when and therefore denies those allegations.

C257.  On September 2, 1996, APA President SOVICH announced an agreement in principle for a new Collective Bargaining Agreement that would be subject to a union member ratification vote.

A257.  The APA denies the allegations of Paragraph 257 of the

Complaint.

C258.  In the announcement, SOVICH endorsed and took personal responsibility for the terms of the agreement in principle, stating that "any short-comings in this proposed contract should be laid at my door and no one else's."

A258.  The APA denies the allegations of Paragraph 258 of the

Complaint.

C259.  Although the President of APA calls and chairs meetings of the APA BOD, the President of APA does not have a vote on the APA BOD. Regarding policy decisions and contract votes, the President of APA must rely on those members of the APA BOS who support him in order to advance and promote his agenda.

A259.  The APA admits the allegations of the first sentence of Paragraph

259 of the Complaint but denies the allegations of the second sentence.

C260.  On September 13, 1996, as a member of the APA BOD, REEDY seconded and then voted in favor of the Resolution (R96-83) calling for SOVICH's agreement in principle to be put in contract language for review by the APA BOD as a Tentative Agreement ("TA #1").

A260.  The APA admits the allegations of Paragraph 260 of the Complaint

that, as a member of the Board of Directors, Reedy seconded and voted in favor

of Resolution R96-83 on September 13, 1996.  Because that Resolution speaks for

itself, the APA denies the remaining allegations of Paragraph 260 in that they

attempt to characterize the substance of the Resolution and the Tentative

Agreement (and do so incorrectly in any case).

C261.  On November 20, 1996, as a member of the APA BOD, REEDY presented and then voted in favor of the Resolution (R96-102) to approve TA #1 to have it sent to the membership for a ratification vote.

A261.  The APA denies the allegation of Paragraph 261 of the Complaint

that the TA #1 first referenced in Paragraph 260 was approved, but admits the

remaining allegations of Paragraph 261.

C262.  As these events unfolded, union members began campaigning and continued to campaign in the workplace of AMERICAN against TA #1.

A262.  The APA admits the allegations of Paragraph 262 of the Complaint

and further states that some union members campaigned in favor of the proposed

TA.

C263.  HELD was an active participant in a spontaneously-formed group of union members engaged in organized opposition to TA #1, a group which eventually came to be known as Pilots Defending the Profession ("PDP").

A263.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 263 of the Complaint and therefore denies

those allegations.

C264.  While serving in the elected union office of APA ORD Vice Chairman, REEDY took a hostile position against the rights of union members to engage in campaigning in the workplace against TA #1.

A264.  The APA admits that Reedy was ORD Vice Chairman at the time,

but denies the remaining allegations of Paragraph 264 of the Complaint.

C265.  On information and belief, REEDY removed campaign literature of opponents to ratification from AMERICAN's workplace in 1996.

A265.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 265 of the Complaint and therefore denies

those allegations.

C266.  On information and belief, JIRSCHELE removed campaign literature of opponents to ratification from AMERICAN's workplace in 1996.

A266.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 266 of the Complaint and therefore denies

those allegations.

C267. On information and belief, REEDY admitted and defended his removal of campaign literature of opponents to ratification from AMERICAN's workplace.

A267. The APA lacks information sufficient to form a belief as to the

truth of Paragraph 267 of the Complaint and therefore denies those allegations.

C268. By December 1996, HELD was known by AMERICAN, APA, JIRSCHELE, SOVICH, and REEDY to be directly involved in union campaigning on the premises of AMERICAN and supporting the rights of those similarly engaged, including assisting members in filing one or more grievances.

A268. The APA admits that at a certain point in time – although perhaps

not December 1996 – it was aware that Held was involved in union campaigning

on the premises of American but denies the remaining allegations of Paragraph

268 of the Complaint.

C269. On January 8, 1997, the ballots on the membership referendum on TA #1 were tallied. The vote was approximately 2:1 against ratification, with approximately 96% participation.

A269. The APA admits the allegations of Paragraph 269 of the Complaint

that the membership ballots on a proposed TA (albeit perhaps not the TA #1

referenced in Paragraph 260) were counted on January 8, 1997, and the proposed

TA was defeated. The APA denies the remaining allegations of Paragraph 269.

C270. In early 1997, after the membership rejected the TA #1 he had supported so strongly, REEDY resigned his union office, necessitating a special election to fill his seat for the few months remaining in his term.

A270. The APA admits the allegations of Paragraph 270 of the Complaint

that Reedy resigned his union office and a special election ensued, but denies that

65

the resignation had any link to the TA vote and denies the remaining allegations

of Paragraph 270.

C271.  In early 1997, REEDY telephoned the home of HELD several times late in the evening and engaged in disoriented and belligerent verbal attacks on HELD and his wife until they were forced to unplug their phone to stop the harassment and abuse.

A271.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 271 of the Complaint and therefore denies

those allegations.

C272.  In December 1996, after several individual members filed grievances regarding actions by AMERICAN to stop or limit their right to engage in political discourse in non-work areas on the premises of AMERICAN, SOVICH also filed a "Presidential" grievance.

A272.  The APA admits that grievances were filed in the period

referenced in Paragraph 272 of the Complaint, including a Presidential grievance

by Sovich, which speak for themselves.  The APA denies the allegations of

Paragraph 272 attempting to characterize the substance of those grievances.

C273.  On information and belief, timely resolution of these individual or "Presidential" grievances was not pursued by either AMERICAN or APA.

A273.  The APA denies the allegations of Paragraph 273 of the

Complaint.

C274.  On or about April 16, 1997, the then Director of Flight – ORD, Robert Kudwa ("Kudwa",)[27], physically assaulted and battered HELD. This occurred as HELD was campaigning in AMERICAN operations after he and other union members had been authorized to do so by the Vice President of Flight of AMERICAN, Cecil Ewell.
[Footnote 27 Robert Kudwa was subsequently appointed by AMERICAN as the successor to Cecil Ewell as Vice President of Flight on/about October 29, 1999.  Kudwa remained in that post until he retired from his employment with AMERICAN after exhausting vacation that began on/about July 11, 2003.]

A274.  The APA admits that Kudwa was Director of Flight-ORD on the date in question but lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 274 of the Complaint and therefore denies those allegations.  The APA admits the allegations concerning Kudwa's employment history in accompanying Footnote 27.

C275.  By May 1997, after continued denial by AMERICAN of union members' right to engage in political discourse in non-work areas on the premises of AMERICAN, HELD and others sued AMERICAN in the United States District Court for the District of Columbia.[28]  [Footnote 28 See *Held v. American Airlines*, 13 F. Supp 2d 20 (D.D.C. 1998)]

A275.  The APA admits the allegation in Paragraph 275 of the Complaint and accompanying Footnote 28 that Held and others sued American in the United States District Court for the District of Columbia.  The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 275 and therefore denies those allegations.

C276.  APA became a Plaintiff-Intervenor in the suit and provided affidavits from witnesses demonstrating its knowledge of the facts and union members involved.

A276.  The APA admits the allegation of Paragraph 276 of the Complaint that it intervened in the suit as a plaintiff after the suit was filed and admits that it gathered and submitted affidavits of witnesses.  The APA further admits that it gained knowledge during the course of drafting those affidavits.  The APA denies the remaining allegations of Paragraph 276.

C277.  On January 22, 1998, Ray Duke was then an APA staff attorney.  Duke is currently Director of the Legal Department for APA and has been in this position at least since January 2005.

A277.  The APA admits the allegations of Paragraph 277 of the Complaint

concerning Duke's status on January 22, 1995, and that he subsequently became

and remains Director of the Legal Department but denies the remaining

allegations of Paragraph 277.

C278.  Duke, as part of the suit, submitted a Declaration to the Court in which he described his involvement and substantial knowledge of the facts and individuals involved which gave rise to the dispute over the right of union members to freely campaign in operations and the status of the grievances on that issue.

A278.  The APA admits that Duke filed a declaration in the suit, which

speaks for itself.  The APA denies the allegations of Paragraph 278 of the

Complaint which attempt to characterize the substance of that declaration.

C279.  Despite AMERICAN's pleadings to the contrary in the suit, the D.C. District Court determined on May 14, 1998 that the individual plaintiffs had standing to sue and that there was sufficient question of anti-union animus by AMERICAN to order a discovery and trial schedule.

A279.  The APA admits the allegations that the D.C. District Court issued

a decision in the case (referenced in Footnote 28), which speaks for itself.  The

APA denies the remaining allegations of Paragraph 279 of the Complaint which

attempt to characterize the substance of that decision.

C280.  Following that May 14, 1998 court order, and just prior to a looming discovery deadline, AMERICAN participated in court-supervised mediated negotiations that led to an agreement resolving the suit.

A280.  The APA admits that American participated in court-supervised

mediated negotiations that led to an agreement resolving the suit after May 14,

1998, but lacks information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 280 of the Complaint and therefore denies

those allegations.

C281.  On June 23, 1998, AMERICAN agreed to a Memorandum of
Understanding ("MOU") providing for the right of union members to engage in union-
related campaigning in non-work areas on the premises of AMERICAN and the suit was
subsequently voluntarily dismissed.

A281.  The APA admits that American agreed to an MOU on June 23,

1998, which speaks for itself, and that the suit was subsequently voluntarily

dismissed.  The APA denies the remaining allegations of Paragraph 281 of the

Complaint, which attempt to characterize the substance of the MOU.

C282.  As a result of the 1997 lawsuit filed by HELD, all members of APA now
enjoy the legal right to campaign for union office in non-work areas at AMERICAN, to
express dissent and distribute materials in non-work areas at AMERICAN regarding
company and union proposals, and to quickly resolve any disputes over those rights, all
under the terms of the MOU.

A282.  Paragraph 282 of the Complaint asserts legal conclusions, to which

no response is required; to the extent a response is required, the allegations of

Paragraph 282 are denied.

C283.  At several times after reaching this MOU, and under the terms of the 1998
MOU, HELD filed grievances pertaining to the implementation of "local rules" for
campaigning on the premises of AMERICAN at Chicago O'Hare Airport ("ORD").

A283.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 283 of the Complaint and therefore denies

those allegations.

C284.  On February 28, 2001, while a candidate for union office, HELD filed a
grievance under the terms of the MOU because AMERICAN had promulgated local rules
for Chicago O'Hare that violated members' rights under the MOU.

A284.  The APA admits the allegations of Paragraph 284 of the Complaint

that Held was a candidate for office on the date referenced and filed a grievance.

The APA lacks information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 284 and therefore denies those allegations.

C285.  Because HELD was a candidate in an ongoing union officer election, his
grievance was handled by "expedited arbitration" under the terms of the MOU.

A285.  The APA admits the allegation of Paragraph 285 of the Complaint

that the arbitration of Held's grievance was expedited.  The remaining allegations

of Paragraph 285 are legal conclusions, to which no response is required; to the

extent a response is required, those allegations are denied.

C286.  On or about March 15, 2001, the arbitrator issued a decision substantially
in favor of HELD.

A286.  The APA admits that an arbitration decision was issued on or

about May 15, 2001, which speaks for itself.  The APA denies the remaining

allegations of Paragraph 286 of the Complaint in that they attempt to characterize

the substance of that decision.

C287.  The arbitrator found that AMERICAN had violated the MOU because
HELD should have been allowed to campaign in the location and manner that he had
desired but AMERICAN's local rules had prohibited.

A287.  The APA denies the allegations of Paragraph 287 of the Complaint

in that those allegations attempt to characterize the substance of an arbitral

decision that speaks for itself.

C288.  During the course of pursuing resolution of the last grievance HELD filed
under the MOU in early 2004, HELD again challenged the "local rules" implemented at
Chicago O'Hare. In an attempt to resolve the grievance, HELD engaged in an e-mail
exchange with the Vice President of Flight of AMERICAN, Mark Hettermann, in which
HELD insisted on, and ultimately achieved, corrective action.

A288.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 288 of the Complaint and therefore denies

those allegations.

C289.  HELD filed a timely grievance appealing his termination under the terms
of the Contract.

A289.  The APA admits the allegation of Paragraph 289 of the Complaint.

C290.  APA and AMERICAN agreed to waive all interim steps of appealing the
termination and schedule it for hearing before a System Board of Adjustment in the first
instance and agreed to convene this Board on August 1, 2005.

A290.  The APA admits the allegations of Paragraph 290 of the

Complaint.

C291.  HELD continued to seek substantive information from APA regarding
case citations, legal theories, and other information so that he could be an informed and
valuable participant in the development and execution of his own defense.

A291.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 291 of the Complaint and therefore denies

those allegations.

C292.  AMERICAN retained counsel from both the Los Angeles and Washington
D.C. offices of the outside law firm Morgan, Lewis and Bockius, LLP to support their
termination of HELD before the System Board of Adjustment.

A292.  The APA admits the allegations of Paragraph 292 of the

Complaint.

C293.  HELD sought legislation from the APA Board of Directors mandating that HELD be represented by the APA General Counsel firm to (a) offset and respond to the substantial legal external resources being utilized by AMERICAN, and (b) address and defend important institutional interests involved, and (c) remedy the appointed counsel's inexperience and ongoing problems with performance.

A293.  The APA admits that Held sought approval from the APA Board

of Directors that the APA General Counsel Firm assist in the litigation of his

grievance but denies the remaining allegations of Paragraph 293 of the

Complaint.  Kathy L. Krieger, a partner in the APA General Counsel Firm, served

as a member of the System Board and, in that position, advocated in support of

Held to the neutral arbitrator.

C294.  On June 24, 2005, the APA Board of Directors voted 11 to 5 to reject R2005-57, a resolution restating APA's previously-expressed institutional positions and providing HELD with representation by the APA General Counsel firm.

A294.  The APA admits that on June 24, 2005, its Board of Directors

voted 11 to 5 to reject R2005-57, a document that speaks for itself.  The APA

denies the remaining allegations of Paragraph 294 of the Complaint, which

attempt to characterize the substance of that document.

C295.  HELD continued to press APA to seek identification of the alleged complainant under the express terms of Section 21.B.4. of the Contract.[29]  [Footnote 29 See, Exhibit 9, *Section 21.B.4.* "[T]he Company may redact names and other personal identifiers at the preliminary investigative proceeding. It is understood that should the matter proceed to the System Board, the Company will provide the Association such statements without redactions."]

A295.  The APA admits the allegations of Paragraph 295 of the Complaint

and accompanying Footnote 29.  The APA did, in fact, seek the identification.

See Complaint ¶237 & n.25.  However, the arbitrator repeatedly ruled that the

complainant's identity was irrelevant.  See, e.g., Ex. 7 to the Complaint.

C296.  There is no provision in any part of the Contract for AMERICAN to claim exception or privilege to the provisions of Section 21.B.4.

A296.  Paragraph 296 of the Complaint asserts a legal conclusion, to which no response is required; to the extent a response is required, the APA denies the allegations of Paragraph 296.  The System Board ruled against the APA's efforts to uncover the name of the alleged complainant.

C297.  On information and belief, there is no bargaining history or past practice between AMERICAN and APA that would entitle AMERICAN to claim exception or privilege to the provisions of Section 21.B.4.

A297.  Paragraph 297 of the Complaint asserts a legal conclusion, to which no response is required; to the extent a response is required; the allegations of Paragraph 297 are denied.

C298.  On July 14, 2005, APA sent a letter to the arbitrator seeking his assistance in enforcing the disclosure provisions of Section 21.8.4. as well as other rights.

A298.  As alleged in Footnote 25 to Complaint ¶ 237, the APA admits that on July 14, 2005, the APA petitioned the arbitrator for a "John Doe" subpoena for the alleged complainant.  The APA denies the remaining allegations of Paragraph 298 of the Complaint in that attempt to characterize the substance of that petition.

C299.  On July 22, 2005, counsel for AMERICAN, RJ Hendricks, responded to the arbitrator regarding the July 14, 2005 APA letter.

A299.  The APA admits the allegations of Paragraph 299 of the Complaint.

C300.  On behalf of AMERICAN, Hendricks claimed AMERICAN could conceal the identity of the complainant they were compelled to disclose under Section 21.B.4. because (a) HELD admitted the conduct, and/or (b) AMERICAN did not intend to use the complainant as a witness, and/or (c) AMERICAN claimed that the motives of the complainant were not relevant.

A300.  The APA denies the allegations of Paragraph 300 of the Complaint

because they attempt to characterize the substance of the Hendricks response,

which speaks for itself.

C301.  The arbitrator scheduled a conference call for July 25, 2005 to decide the matters in dispute.

A301.  The APA admits the allegations of Paragraph 301 of the

Complaint.

C302.  HELD requested to Kennedy that he be allowed to participate on the call, even if only to listen.

A302.  The APA admits the allegations of Paragraph 302 of the

Complaint.

C303.  Kennedy reported to HELD that she proposed HELD be allowed to participate but that the arbitrator denied HELD the right to be on the call.

A303.  The APA admits the allegations of Paragraph 303 of the

Complaint.

C304.  HELD then asked Kennedy if the arbitrator would allow his own counsel (Bodian) to participate.

A304.  The APA denies the allegations of Paragraph 304 of the Complaint and further states that Held had not yet informed Kennedy that he had retained additional counsel.

C305.  Kennedy reacted in an angry and hostile fashion to this suggestion.

A305.  The APA denies the allegations of Paragraph 305 of the Complaint.

C306.  On information and belief, Kennedy never proposed or asked the arbitrator to allow HELD to participate, listen, or be represented by his own counsel on the call.

A306.  The APA denies the allegations of Paragraph 306 of the Complaint.

C307.  On information and belief, during the July 25, 2005 conference call, the arbitrator gave a verbal order and made the following conclusions about the facts of the case before the System Board Hearing convened: (a) The name of the complainant was not relevant; (b) AMERICAN did not need to explain how the HELD's January 22, 2005 C&R Post violated Rule 32; (c) AMERICAN did not need to provide unredacted copies of documents because it was not relevant who complained; and (d) if it appeared the identity of the individual turned out to be relevant, he would revisit his order.

A307.  The APA denies the allegations of Paragraph 307 of the Complaint under heading (b) but admits the remaining allegations of Paragraph 307.

C308.  Without further objection, APA allowed the System Board Hearing to proceed despite this prejudicial ruling by the arbitrator to grant unprecedented license to AMERICAN in violation of clear language and intent of the Contract at the expense of HELD's fundamental rights to due process including the right to confront his accuser.

A308.  The APA denies the allegations of Paragraph 308 of the Complaint but admits that at no time after the arbitrator's ruling did the APA attempt to stop or forfeit the arbitration.

C309.  Even in February 2006, when new evidence was discovered showing that the identity of the individual was relevant, Kennedy did not advocate for HELD, and the

arbitrator refused to reconvene and hear the evidence despite a substantiated request to do so made directly by Bodian.[30]  [Footnote 30 See Exhibit 6, David Bodian Feb 11, 2006 letter.]

A309.  The APA admits that Bodian raised the complainant identity issue again in a February 11, 2006, letter and the arbitrator rejected that effort but denies the remaining allegations of Paragraph 309 of the Complaint and accompanying Footnote 30.

C310.  On information and belief, AMERICAN's reason for concealing REEDY's identity had nothing to do with the purported belief that HELD would "retaliate" against REEDY, but was purposeful misdirection because AMERICAN was concerned that HELD would discover additional relevant facts and successfully hold AMERICAN liable for unlawful interference with the union and JIRSCHELE, SOVICH, CONDES and REEDY liable for wrongful interference with HELD's employment.

A310.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 310 of the Complaint and therefore denies those allegations.

C311.  On August 1, 2005, three days of hearings were held at APA headquarters before a System Board of Adjustment convened under the authority of the RLA (45 U.S.C. § 184) and Section 23 of the Contract.[31]  [Footnote 31 See, Exhibit 10, *Section 23*.]

A311.  The APA admits that three days of hearings began on August 1, 2005.  To the extent that Paragraph 311 of the Complaint and accompanying Footnote 31 assert legal conclusions, no response is required; to the extent a response is required, those allegations are denied.

C312.  The transcript of the System Board Hearing is attached as Exhibit 5.

A312.  The APA admits the allegations of Paragraph 312 of the Complaint.

C313.  AMERICAN placed Weller on "Special Assignment," providing him with paid time off from work and priority transportation to serve as a witness against HELD at the System Board Hearing.

A313.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 313 of the Complaint and therefore denies those allegations.  Weller did not appear as a witness or in any other capacity at the hearing.

C314.  While on this special assignment for AMERICAN, Weller appeared at the reception area at APA headquarters to be a witness against HELD.

A314.  The APA admits the allegations of Paragraph 314 of the Complaint and further states that Weller had been subpoenaed by American.

C315.  Despite Weller being informed by APA that he must not enter the secure area of the building unless and until he was called as a witness before the System Board, a senior employee of APA allowed Weller to enter the secure area of the building.

A315.  The APA denies the allegations of Paragraph 315 of the Complaint.

C316.  When it was discovered that, after he had been informed he was not to enter the building, Weller had improperly gained access to the building, he was directed to leave and reportedly did so.

A316.  The APA denies the allegations of Paragraph 316 of the Complaint.

C317.  On August 3, 2005, at the conclusion of the System Board Hearing, the Arbitrator established an October 14, 2005 deadline for AMERICAN and APA to file post hearing briefs on their respective positions.

A317.  The APA admits the allegations of Paragraph 317 of the Complaint.

C318.  Kennedy insisted she alone work on the brief and would not share even an outline of the intended brief with HELD.

A318.  The APA denies the allegations of Paragraph 318 of the

Complaint, which are contradicted in any case by Paragraphs 319, 321 and 322 of

the Complaint.

C319.  After approximately 40 days of the 72 day briefing period had already passed, on September 8, 2005, Kennedy proposed to provide HELD with her first draft of the brief on October 5, 2005, still some 27 days away and just nine days before the brief was due, a proposed schedule about which HELD objected.

A319.  The APA denies that Kennedy proposed to provide Held with her

"first" draft but admits the remaining allegations of Paragraph 319 of the

Complaint.

C320.  After 50 of the 72 days before the briefing was due had elapsed, Kennedy had still produced nothing for review, and had little or no communication about the substance of the brief contents with HELD.

A320.  The APA denies the allegations of Paragraph 320 of the

Complaint.

C321.  On September 23, 2005, just 21 days before the filing deadline for the brief, Kennedy was still only able to produce a one page outline of the intended brief.

A321.  The APA denies the allegations of Paragraph 321 of the

Complaint.

C322.  For the next 21 days, as material was drafted and shared, Kennedy rejected substantially all of HELD's rewrites and input.

A322.  The APA denies the allegations of Paragraph 322 of the

Complaint.

C323.  On October 11,2005, three days before the brief filing deadline, Kennedy realized she could not possibly complete the brief before the deadline and was compelled to ask the arbitrator and AMERICAN to consent to a one-week extension of the deadline.

A323.  The APA denies the allegations of Paragraph 323 of the

Complaint.

C324.  When it was finally filed, Kennedy affixed Bodian's name as a signatory
to the briefing without notice to or consent of Bodian.

A324.  The APA denies the allegations of Paragraph 324 of the

Complaint.

C325.  In November 2005, Kennedy provided Bodian with a copy of a draft
decision of the Arbitrator.

A325.  The APA admits the allegations of Paragraph 325 of the

Complaint.

C326.  Kennedy directed that Bodian could not share the draft decision with
HELD.

A326.  The APA admits the allegations of Paragraph 326 of the Complaint

and states that it was APA policy not to share draft System Board decisions with

grievants.

C327.  From November 2005 through February 2006 HELD remained
handicapped in terms of participating in his own defense by Kennedy's directive denying
him a copy of the draft decision.

A327.  The APA denies the allegations of Paragraph 327 of the

Complaint.

C328.  HELD was aware that Bodian attempted to provide input to Kennedy and
the union representatives on the System Board, but HELD was unable to have
meaningful discussion or input with Bodian due to Kennedy's directive.

A328.  The APA admits that Bodian provided input to Kennedy and the APA representatives on the System Board but denies the remaining allegations of Paragraph 328 of the Complaint.

C329.  On information and belief, APA and the union representatives on the System Board were unsuccessful in having any meaningful impact on the decision.

A329.  The APA denies the allegations of Paragraph 329 of the Complaint.

C330.  On information and belief, APA and the union representatives on the System Board resigned themselves early to attempting to "isolate" the decision by filing a "dissent."

A330.  The APA admits that its Union representatives on the System Board filed a dissent but denies the remaining allegations of Paragraph 330 of the Complaint.

C331.  Although APA solicited input from HELD on the dissent at the last minute, HELD was handicapped by both his inability to see the decision being dissented until only one day before receiving the draft dissent, and then being given one day to make input on the dissent. As a result, HELD's input on the dissent was minimal.

A331.  The APA denies the allegations of Paragraph 331 of the Complaint.

C332.  As HELD's termination grievance remained open while awaiting the decision of the System Board, HELD continued his research in an attempt to discover the identity of the then-unknown individual whom JIRSCHELE alleged had contacted him to complain, the complainant's intent and motives in doing so, and the actions and motives of any other then-unknown individuals involved.

A332.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 332 of the Complaint and therefore denies those allegations.

C333.  HELD learned that the alleged complainant was REEDY, a supervisory pilot, or Check Airman.

A333.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 333 of the Complaint and therefore denies those allegations.

C334.  REEDY is not a "line pilot."

A334.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 334 of the Complaint and therefore denies those allegations.

C335.  JIRSCHELE's sworn testimony at the System Board Hearing that REEDY is a "line pilot" was false.

A335.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 335 of the Complaint and therefore denies those allegations.

C336.  JIRSCHELE's sworn testimony at the System Board Hearing that REEDY is a "line pilot" was known to be false by JIRSCHELE at the time he so testified.

A336.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 336 of the Complaint and therefore denies those allegations.

C337.  JIRSCHELE's sworn testimony at the System Board Hearing that REEDY is a "line pilot" was known to be false by AMERICAN at the time JIRSCHELE so testified.

A337.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 337 of the Complaint and therefore denies those allegations.

C338.  Counsel for AMERICAN, RJ Hendricks, also misrepresented to the System Board that REEDY was a line pilot.

A338.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 338 of the Complaint and therefore denies those allegations.

C339.  A "line pilot" at AMERICAN is a pilot who, under the terms of the Contract, occupies a job award based solely on the pilot's seniority with the company and has the reasonable expectation of continued employment indefinitely in that position at AMERICAN until he seeks a new position or retires.

A339.  Paragraph 339 of the Complaint asserts legal conclusions, to which no response is required; to the extent a response is required, the allegations of Paragraph 339 are denied.

C340.  If a line pilot has already fulfilled any "lock in" period (an obligation to hold a job for a contractually-agreed time period) and there is a job vacancy that the pilot would like and the pilot is the most senior pilot who bids for the vacant job, AMERICAN will award, fully train, and qualify the pilot for that new job under the terms of the contract.

A340.  Paragraph 340 of the Complaint asserts legal conclusions, to which no response is required; to the extent a response is required, the allegations of Paragraph 340 are denied.

C341.  The APA Constitution and Bylaws distinguishes between line pilots and Check Airmen.[32]  [Footnote 32 See, APA C&B Article III, Section 2.C., .. *When an executive member resigns from a managerial position and returns to line pilot or check airman status, he/she shall automatically be restored to active membership... "*]

A341.  The APA admits that the APA Constitution and Bylaws contains the language quote in Footnote 32, accompanying Paragraph 341 of the Complaint.  The remainder of Paragraph 341 asserts legal conclusions to which

no response is required; to the extent a response is required, those allegations of

Paragraph 341 are denied.

C342.  A Chief Pilot/Base Manager does not have approval or "veto" authority over the award of a "line pilot" position to any pilot who bids it.

A342.  Paragraph 342 of the Complaint asserts a legal conclusion to which

no response is required; to the extent a response is required, the allegations of

Paragraph 342 are denied.

C343.  Because of their selection method and the well-known supervisory role of Check Airmen, in the context of this case and testinl0ny given, AMERICAN's characterization of an individual who they knew was a Check Airman as a "line pilot" and "non-management pilot" was purposefully misleading.

A343.  Because of the vagueness of the allegations of Paragraph 343 of

the Complaint, the APA cannot admit or deny them and must be deemed to deny

them.

C344.  On information and belief, selection as a Check Airman requires the recommendation and approval of the Chief Pilot.

A344.  The APA denies the allegations of Paragraph 344 of the

Complaint.

C345.  On information and belief, after a Check Airman is in the position, a Chief Pilot has ongoing influence regarding the Check Airman's continued service.

A345.  The APA denies that a Chief Pilot has any more "influence" over a

Check Airman than over any other pilot and therefore denies the allegations of

Paragraph 345 of the Complaint.

C346.  In the AMERICAN Flight Manual Part 1,[33] AMERICAN explains the official relationship between managers and Check Airmen.  [Footnote 33 *AA Flight Manual Part 1* is AMERICAN's primary guidance from the Flight Department to pilots regarding airline operations.]

A346.  The APA admits the existence of American's Flight Manual Part 1, which speaks for itself.  The APA denies the allegations of Paragraph 346 of the Complaint and accompanying Footnote 33 in that they attempt to characterize the substance of the Manual.

C347.  In Part I, AMERICAN states that "managers develop and maintain the policies and procedures of our airline and department with the input of our pilots and Check Airmen" and AMERICAN states that "Check Airmen serve as facilitators and leaders in maintaining those standards."

A347.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 347 of the Complaint and therefore denies those allegations.

C348.  AMERICAN has used and continues to use Check Airmen as agents of management to communicate and advance management programs, policies, political positions, and collective bargaining objectives on behalf of AMERICAN's management, especially during periods of contract negotiations, in a manner that goes well beyond their stated FAA-approved purpose.[34]  [Footnote 34 See, *AA Flight Manual Part I*, Section 3, Paragraph 11.1. "A. Check Airmen are airmen designated by the air carrier and approved by the FAA. They examine other airmen to determine their proficiency with respect to procedures, techniques, and their competence to perform their respective airman duties.  B. Check Airmen must be authorized by AA and the FAA through the Managing Director of Flight Training and Standards."]

A348.  The APA lacks information to form a belief as to the truth of the allegations of Paragraph 348 of the Complaint and therefore denies those allegations.  The APA admits that the Flight Manual contains the language quoted in Footnote 34, as well as additional language.

C349.  On information and belief, JIRSCHELE recommended REEDY for his job as a supervisory pilot.

A349.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 349 of the Complaint and therefore denies those allegations.

C350.  On information and belief, REEDY's continued employment as a supervisory pilot is influenced by whether REEDY maintains JIRSCHELE's continued support.

A350.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 350 of the Complaint and therefore denies those allegations.

C351.  On information and belief, REEDY has never posted a single message to C&R.

A351.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 351 of the Complaint and therefore denies those allegations.

C352.  On information and belief, REEDY has not routinely, if ever, read messages on the C&R web site.

A352.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 352 of the Complaint and therefore denies those allegations.

C353.  On information and belief, REEDY did not read HELD's January 22, 2005 C&R Post on C&R as represented by counsel for AMERICAN, RJ Hendricks.

A353.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 353 of the Complaint and therefore denies those allegations.

C354.  On information and belief, since at least 1996, REEDY has continuously maintained an account with America Online which he has used to send and receive Internet e-mail for personal and union-related issues.

A354.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 354 of the Complaint and therefore denies

those allegations.

C355.  On information and belief, REEDY discussed with CONDES the issue of HELD's January 22, 2005 C&R post on several occasions prior to AMERICAN's receipt of the printout of the SOVICH "Policing our own" blast and prior to the February 3, 2005 letter suspending HELD's employment.

A355.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 355 of the Complaint and therefore denies

those allegations.

C356.  At no time did CONDES ever disclose that he discussed HELD's January 22, 2005 C&R post with REEDY or describe the substance of those discussions.

A356.  The APA admits the allegations of Paragraph 356 of the Complaint

but states that there may have been no discussion with Reedy for Condes to

disclose.

C357.  On information and belief, the nature of communications by AMERICAN, JIRSCHELE, SOVICH, CONDES and REEDY following HELD's January 22, 2005 C&R post suggests that AMERICAN does monitor C&R or encourages union members to monitor and report on C&R on behalf of AMERICAN.

A357.  The APA denies the allegations of Paragraph 357 of the

Complaint.

C358.  On information and belief, on January 26, 2005, an employee in AMERICAN's "information technology" department, Carl Davis ("Davis"), acting on behalf of AMERICAN, called the former Vice President of Flight for AMERICAN, Robert Kudwa ("Kudwa") to report pending action against HELD.

A358.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 358 of the Complaint and therefore denies

those allegations.

C359. In January 2005, Kudwa had been retired from, and was no longer an employee of, AMERICAN and had not been an employee for well over one year.

A359. The APA admits the allegations of Paragraph 359 of the

Complaint.

C360. On information and belief, Davis or another presently-unknown person(s) employed by or working on behalf of AMERICAN, or SOVICH, or CONDES acquired the text of HELD's January 22, 2005 C&R post and provided it to REEDY who had a well-known political "axe to grind" against HELD.

A360. The APA denies the allegations of Paragraph 360 of the Complaint

as they concern Condes or Sovich. The APA lacks information sufficient to form

a belief as to the truth of the remaining allegations of Paragraph 360 and therefore

denies them.

C361. On information and belief, REEDY then "made the complaint" to JIRSCHELE by calling his cellular phone and then transmitting the Plain Text Fax to JIRSCHELE at his hotel on January 30, 2005.

A361. The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 361 of the Complaint and therefore denies

those allegations.

C362. On information and belief, JIRSCHELE called REEDY back confirming receipt of the fax at his hotel.

A362.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 362 of the Complaint and therefore denies those allegations.

C363.  On information and belief, after receiving the fax implicating HELD, JIRSCHELE did not call the APA ORD Chairman, Ron Hunt, but instead called the APA ORD Vice Chairman CONDES.

A363.  The APA admits that Jirschele called Condes after Jirschele had received a copy of Held's C&R posting.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 363 of the Complaint concerning whether Jirschele attempted to call APA ORD Chair Ron Hunt and therefore denies those allegations.

C364.  On information and belief, on February 1, 2005, two days after transmitting the Plain Text Fax to JIRSCHELE at his hotel, REEDY did not call the APA ORD Chairman, Ron Hunt, but instead called the APA ORD Vice Chairman CONDES.

A364.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 364 of the Complaint and therefore denies those allegations.

C365.  On information and belief, REEDY called CONDES before REEDY had acquired the web page version of the "Policing our own" blast of SOVICH he purportedly provided to JIRSCHELE.

A365.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 365 of the Complaint and therefore denies those allegations.

C366.  On information and belief, Davis or another presently-unknown person(s) employed by or working on behalf of AMERICAN, SOVICH, or CONDES provided

REEDY with a copy of the web page version of the "Policing our own" blast of SOVICH who then provided it to JIRSCHELE on or after February 1, 2005.

A366.  The APA denies the allegations of Paragraph 366 of the Complaint as they concern Sovich or Condes.  The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 366 of the Complaint and therefore denies those allegations.

C367.  On information and belief, on February 4 and again on February 5, 2005, beginning the day after HELD was suspended pending investigation, Davis again called Kudwa to discuss the suspension of HELD.

A367.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 367 of the Complaint and therefore denies those allegations.

C368.  On February 13, 2006, considering the facts and implications in paragraphs 333 through 367 above were material facts that had not been considered by the System Board (as the result of obstruction and fraudulent misrepresentation by AMERICAN), the prejudicial denial of HELD's right to due process by the arbitrator's decision to allow AMERICAN to conceal the identity of the alleged complainant, and AMERICAN'S violation of Section 21.B.4. of the Contract, HELD made formal motion, through Bodian, that the System Board reconvene to consider the new evidence and take testimony.35  [Footnote 35 See, Exhibit 6, Bodian letter, February 13, 2006]

A368.  The APA admits that Held through Bodian made the motion to reconvene referenced in Paragraph 368 of the Complaint and accompanying Footnote 35, but denies the remaining allegations of Paragraph 368.

C369.  Counsel for AMERICAN, RJ Hendricks, responded in a February 15, 2006 letter in which, among other things, AMERICAN effectively admitted the fraudulent nature of their prior sworn testimony and representations that the complainant was a "line pilot."

A369.  The APA admits that American's counsel Hendricks responded to the motion to reconvene in a February 15, 2006, letter, which speaks for itself.

The APA denies the remaining allegations of Paragraph 369 of the Complaint in

that they attempt to characterize the substance of that letter.

C370.  AMERICAN acknowledged misleading testimony they gave under oath by abandoning the claim that a supervisory pilot – a Check Airman – was a "line pilot" and revising it to only claim that REEDY was a non-management pilot.

A370.  The APA denies the allegations of Paragraph 370 of the Complaint

in that they attempt to characterize the substance of the letter referenced in

Paragraph 370, which speaks for itself.

C371.  On information and belief, on or after February 15, 2006, the Arbitrator notified the members of the System Board that he would not reconvene or consider new evidence. This decision was relayed to Bodian via e-mail.

A371.  The APA admits that the arbitrator denied the motion to reconvene

but lacks information sufficient to form a belief as to the truth of the remaining

allegations of Paragraph 371 of the Compliant and therefore denies those

allegations.

C372.  On February 22, 2005, the System Board of Adjustment published its decision to sustain the termination.[36]  [Footnote 36 <u>See</u>, Exhibit 7, System Board decision, February 22, 2006.]

A372.  The APA admits the allegations of Paragraph 372 of the Complaint

and accompanying Footnote 36.

C373.  Until at least February 15, 2005, HELD had maintained real hope that his employment would be restored by the System Board of Adjustment.

A373.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 373 of the Complaint and therefore denies

those allegations.

C374.  On February 27, 2006, union-appointed System Board member Robert Ames wrote a letter to the APA Board of Directors laying out the institutional damage that would be caused to APA if they did not pursue legal action to correct the injustice of the arbitrator's decision.[37]  [Footnote 37 <u>See</u>, Exhibit 8, Ames letter, February 27, 2006.]

A374.  The APA admits that union appointed member Robert Ames wrote a February 27, 2006, letter to the APA Board of Directors, Ex. 8 to the Complaint, which speaks for itself.  The APA denies the remaining allegations of Paragraph 374 of the Complaint and accompanying Footnote 37 in that they attempt to characterize the substance of that letter.

C375.  The APA Board of Directors met from February 27 to March 3, 2006 and took no action on the issues raised in Ames' letter.

A375.  The APA admits the allegations of Paragraph 375 of the Complaint.

C376.  APA handled and decided all aspects of HELD's February 26, 2005 Article VII complaint against SOVICH[38] with incompetence, interference, undue and improper prejudice against HELD, and hostility toward HELD.  [Footnote 38 <u>See</u>, paragraph 199 regarding Held's February 26, 2005 Article VII complaint.]

A376.  The APA admits that Held filed an Article VII Complaint against Sovich but denies the remaining allegations of Paragraph 376 of the Compliant and accompanying Footnote 38.

C377.  On May 27, 2005, the APA Appeal Board published its decision dismissing all aspects of HELD's February 26, 2005 Article VII complaint against SOYICH.[39]  [Footnote 39 *Id.*]

A377.  The APA admits the allegations of Paragraph 377 of the Complaint and accompanying Footnote 39.

C378.  Until receiving the May 27, 2005 dismissal, HELD was never contacted or advised of any progress, hearing, or investigation into his complaint.

A378.  The APA denies the allegations of Paragraph 378 of the Complaint.

C379.  In their decision, the APA Appeal Board characterized the Rob Held Please Post materials produced and distributed by APA as "Sovich's posters."

A379.  Because the May 27, 2005, Appeal Board decision speaks for itself, the APA denies the allegations of Paragraph 379 of the Compliant, which attempt to characterize the substance of that decision.

C380.  On June 13, 2005, HELD sent a letter to James Eaton, Secretary-Treasurer for APA ("Eaton"), in which HELD challenged the dismissal by the Appeal Board and requested information regarding the selection of the arbitrator to hear the challenge.

A380.  The APA admits that Held sent a June 13, 2005, letter to APA Secretary-Treasurer Eaton regarding the Appeal Board decision, which letter speaks for itself.  The APA denies the remaining allegations of Paragraph 380 of the Complaint in that they attempt to characterize the substance of that letter.

C381.  On June 24, 2005, almost a month after the Appeal Board dismissed HELD's Article VII complaint, SOVICH participated in interviewing and voted in favor of the selection of Thomas Geoghegan ("Geoghegan") and Richard Carlson ("Carlson") to serve on a newly-created Public Review Board ("PRB").

A381.  The APA admits the allegations of Paragraph 381 of the Complaint.

C382.  The PRB was empowered by a recent change of the APA Constitution and Bylaws to hear – and purportedly decide with legal finality – all internal disputes between union members under Article VII of the APA Constitution and Bylaws.

A382.  The APA admits that the PRB was initiated under a change to the APA Constitution and Bylaws, and the amended Constitution speaks for itself.

The APA denies the remaining allegations of Paragraph 382 of the Compliant in

that they attempt to characterize the substance of the amendment.

C383.  On July 11,2005, Eaton replied to HELD stating that his challenge would not be heard by an arbitrator as provided for in the APA Constitution and Bylaws in effect at the time of the alleged offense (and in effect until four days before the Appeal Board dismissed HELD's complaint), but that it would be handled through the newly-created two-member PRB.

A383.  The APA admits that Eaton wrote a letter to Held on July 11, 2005,

which letter speaks for itself.  The APA denies the remaining allegations of

Paragraph 383 of the Complaint in that they attempt to characterize the substance

of that letter.

C384.  In the July 11, 2005 letter, Eaton told HELD that his challenge of the decision had been sent to the PRB and that he should await further instructions.

A384.  The APA denies the allegations of Paragraph 384 of the Complaint

in that they attempt to characterize the substance of the Eaton letter referenced in

Paragraph 383.

C385.  Nine months later, on April 17, 2006, having not heard from Eaton or the PRB, HELD inquired by letter to Eaton as to the status of the challenge.

A385.  The APA admits that Held sent a letter dated April 17, 2006, to

Eaton.  The APA lacks information sufficient to form a belief as to the truth of the

allegations of Paragraph 385 of the Compliant concerning Held's reasons for

sending the letter and therefore denies those allegations.

C386.  On April 19, 2006, Eaton replied and stated that there had been an "error" in handling his challenge and that the PRB never received the notice of challenge.

A386.  The APA admits that Eaton responded to Held by Letter on April 19, 2006, and that letter speaks for itself. The APA denies the remaining allegations of Paragraph 386 of the Complaint in that they attempt to characterize the substance of Eaton's letter.

C387.  Eaton also stated that HELD was longer entitled to PRB review because he had been terminated by AMERICAN but that, "in the interest of fairness," the matter would now be handled by the PRB.

A387.  The APA denies the allegations of Paragraph 387 of the Complaint in that they attempt to characterize the substance of the Eaton letter referenced in Paragraph 386, which speaks for itself.

C388.  On or about April 21, 2006, HELD received a package from APA with 17 documents related to the PRE including a 3-page document titled "Rules for Appeals," October 4, 2005.

A388.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 388 of the Complaint and therefore denies those allegations.

C389.  On May 18, 2006, in accordance the PRB Rules for Appeals, HELD filed a comprehensive brief and motion requesting that a hearing be convened since there had never been a hearing.

A389.  The APA admits that Held filed a brief and motion on or about May 18, 2006, which, *inter alia*, sought a hearing.  The remainder of Paragraph 389 asserts legal conclusions, to which no response is required; to the extent a response is required, those allegations are denied.

C390.  On June 1, 2006, PRB member Geoghegan issued an order recusing himself, leaving the remaining PRB member, Carlson, to decide the case.

A390.  The APA admits the allegations of Paragraph 390 of the Complaint.

C391.  On June 30, 2006, HELD received notice that Carlson was still reviewing the case and that the Respondent (SOVICH) had not filed a reply brief, nor had he opposed HELD's motion to convene a hearing.

A391.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 391 of the Complaint and therefore denies those allegations.

C392.  HELD received no notice of any PRB hearings or inquiry.

A392.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 392 of the Complaint and therefore denies those allegations.

C393.  On July 11, 2006, eight days before a decision by the PRB was due and well after the deadline for the submission of a brief from SOVICH, HELD received a copy of a letter from APA Director of Legal, Ray Duke, addressed to Carlson.

A393.  The APA admits that APA Director of Legal Ray Duke sent a July 11, 2006, letter to Carlson with a copy to Held.  The APA denies the remaining allegations of Paragraph 393 of the Complaint.

C394.  In the July 11, 2006 letter, Duke wrote that SOVICH had consulted with Duke over the weekend regarding HELD's brief to the PRB and had provided Duke with a copy of HELD's brief.

A394.  The APA denies the allegations of Paragraph 394 of the Complaint

in that they attempt to characterize the substance of the Duke letter referenced in

Paragraph 394, which speaks for itself.

C395.  Even though neither APA nor Duke were a party to the issue before the
PRB, Duke made it clear he did not agree with HELD, wanted that disagreement
understood by the PRB, and offered to interfere even further if Carlson would allow it.

A395.  The APA denies the allegations of Paragraph 395 of the Complaint

that attempt to characterize the substance of the Duke letter, which speaks for

itself, and denies the remaining allegations of Paragraph 395.


C396.  According to the rules promulgated by the PRB, a decision on HELD's
challenge was required not later than July 19, 2006.

A396.  Paragraph 396 of the Complaint asserts legal conclusions, to which

no response is required; to the extent a response is required, those allegations are

denied.

C397.  A week after the deadline for decision, on July 26, 2006, HELD received a
decision in which Carlson dismissed HELD's complaint against SOVICH it is entirety.

A397.  The APA admits that Carlson dismissed Held's Complaint against

Sovich in its entirety on or about July 26, 2006, but denies the remaining

allegations of Paragraph 397 of the Complaint.

C398.  On information and belief, despite their early conclusion that the words
within HELD's January 22, 2005 C&R post constituted a violation of AMERICAN's
Rules of Conduct and the Work Environment Policy, AMERICAN took no action against
SOVICH after learning that SOVICH had taken HELD's January 22, 2005 C&R post out
of its protected union hall and placed it in the AMERICAN work environment.

A398.  The APA denies the allegations of Paragraph 398 of the

Complaint.

C399.  In testimony before the System Board on August 1, 2005, AMERICAN testified under oath that they "recommended that [SOVICH] be coached and counseled" for placing material they believed to be hate-related into the work environment.

A399.  The APA admits that the quoted language appears in the transcript of the System Board hearing, Ex. 7 to the Complaint, and that transcript speaks for itself.  The APA denies the allegations of Paragraph 399 of the Complaint to the extent they attempt to characterize the substance of that transcript.

C400.  Despite the testimony by AMERICAN and subsequent representations by AMERICAN, on information and belief, no such "coaching and counseling" of SOVICH for his "Policing our own" blast ever occurred.

A400.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 400 of the Complaint regarding American and therefore denies those allegations.  The APA admits that Sovich was not coached and counseled.

C401.  Despite knowing that SOVICH had placed material they believed to be hate-related into the work environn1ent, AMERICAN did not request removal of the allegedly offensive material[40] and AMERICAN never blocked access to the APA web site under the terms of the January 8, 2004 letter of agreement regarding disputes about "derogatory" content on the APA web site.  [Footnote 40 Shortly after the System Board Hearing, APA reported to HELD that AMERICAN requested that the "Policing our own" blast be removed from the APA web site. APA told HELD that that APA declined to remove it until after the System Board decision in the HELD case had been published.]

A401.  The APA denies the allegations of Paragraph 401 of the Complaint with respect to a request for removal in that those allegations are directly contradicted by accompanying Footnote 40.  The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 401 and therefore denies those allegations.

C402.  On November 11, 2005, SOVICH sent an e-mail blast to APA BOS titled "This will offend some (meant only for humor)" in which he published into the work environment of AMERICAN a "joke" containing disparaging and demeaning comments about women and people of French heritage.

A402.  The APA admits that Sovich sent a November 11, 2005, email to APA BOS that contains the language quoted in Paragraph 402 of the Complaint, and that email speaks for itself.  The APA denies the remaining allegations of Paragraph 402 in that they attempt to characterize the substance of that email.

C403.  On information and belief, AMERICAN subsequently "coached and counseled" SOVICH for his November 11, 2005 blast and made a record in his Permanent Employee History file ("PEH").

A403.  The APA admits the allegations of Paragraph 403 of the Complaint.

C404.  On information and belief, SOVICH grieved the discipline by AMERICAN.

A404.  The APA admits the allegations of Paragraph 404 of the Complaint.

C405.  On information and belief, after being disciplined for his November 11, 2005 blast, SOVICH and his political supporters within APA began an effort to retaliate against the person they had been told by AMERICAN had made the complaint leading to SOVICH' s discipline.

A405.  The APA denies the allegations of Paragraph 405 of the Complaint.

C406.  On information and belief, despite its policies regarding confidentiality and retaliation, AMERICAN told SOVICH and/or other APA officials that the individual who had complained to them about his November 11, 2005 blast was the Chairman of the APA New York Domicile, Samuel Mayer.

A406.  The APA admits that Sovich was informed at his grievance hearing that Mayer had complained about the November 11, 2005, email blast.

The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 406 of the Complaint and therefore denies those allegations.

C407.  On information and belief, AMERICAN knew that Mayer and SOVICH were in opposite political factions within the union.

A407.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 407 of the Complaint and therefore denies those allegations.

C408.  On information and belief, AMERICAN made such disclosure to assist and support SOVICH and his political faction within APA.

A408.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 408 of the Complaint and therefore denies those allegations.

C409.  On information and belief, AMERICAN made such disclosure to aid SOVICH in engaging in political retaliatory action against Mayer.

A409.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 409 of the Complaint concerning American's thought processes and therefore denies those allegations.  The APA denies that Sovich engaged in any retaliatory action against Mayer.

C410.  On information and belief, in or around April 2006, members of APA's Board of Directors engaged in discussion via group e-mail concerning the discipline of SOVICH for his November 11, 2005 blast.

A410.  The APA admits the allegations of Paragraph 410 of the

Complaint.

C411.  On information and belief, SOVICH initiated the e-mail discussion by directly accusing Mayer of trying to get him fired for his November 11, 2005 blast.

A411.  The APA denies the allegations in Paragraph 411 of the Complaint

that Sovich initiated the email discussion but admits the remaining allegations of

Paragraph 411.

C412.  On information and belief, during such e-mail discussion, the Vice Chairman of the APA Washington D.C. Domicile, Keith Wilson, demanded to know if Mayer had filed a Rule 32 complaint against SOVICH.

A412.  The APA denies that Wilson "demanded" anything but admits the

remaining allegations of Paragraph 412 of the Complaint.


C413.  On information and belief, Mayer did not respond to the allegations during the e-mail discussion.

A413.  The APA denies the allegations of Paragraph 413 of the

Complaint.

C414.  On information and belief, during the course of a regular Meeting of the APA Board of Directors on May 4, 2006, the Chairman of the APA Washington D.C. Domicile, Gary Boettcher ("Boettcher") caused Mayer to be asked by APA President Ralph Hunter, on the record, if Mayer had filed a Rule 32 complaint against SOVICH.

A414.  The APA admits the allegations of Paragraph 414 of the

Complaint.

C415.  On information and belief, the result of this public inquiry was the complete breakdown of order at the APA Board of Directors meeting, which had to be recessed within minutes.

A415.  The APA denies the allegations of Paragraph 415 of the

Complaint.

C416.  On information and belief, just before the Board meeting completely broke down and was recessed, SOVICH demonstrated his knowledge that (a) he had been told by AMERICAN that Mayer had written a letter and (b) that AMERICAN would provide an unredacted copy of that letter to SOVICH.

A416.  The APA denies the allegations of Paragraph 416 of the

Complaint.

C417.  On information and belief, SOVICH loudly announced to all present that Mayer's letter of complaint "would all come out in the arbitration."

A417.  The APA admits the allegations of Paragraph 417 of the Complaint

but denies that Sovich spoke "loudly."

C418.  On information and belief, the events of May 4, 2006, were related in an anonymous letter of May 17, 2006 to the President of AMERICAN, Gerard Arpey, and AMERICAN's HR Work Environment department.[41]  [Footnote 41 <u>See</u>, Exhibit 13, *Anonymous Letter*, May 17, 2006]

A418.  The APA lacks information to form a belief as to the truth of the

allegations of Paragraph 418 of the Complaint and accompanying Footnote 41

and therefore denies those allegations.  The APA admits that a memorandum

purporting to be from an unidentified American employee to Gerard Arpey and

others is attached to the Complaint as Ex. 13, as alleged in Footnote 41.

C419.  On information and belief, the May 17, 2006 letter was also received in the mail by a number of APA members and APA officers.

A419.  The APA admits that certain APA officials received the letter in

question, albeit not by mail.  The APA lacks information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 419 of the

Complaint and therefore denies them.

C420.  On information and belief, APA has a complete audio recording of the comments by APA BOD members during the Board meeting of May 4, 2006.

A420.  The APA denies the allegations of Paragraph 420 of the Complaint.

C421.  On information and belief, AMERICAN has neither investigated nor taken any action against those who engaged in retaliatory political action inside the union against Mayer because they believed he filed a Rule 32 complaint against SOVICH.

A421.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 421 of the Complaint and therefore denies those allegations.

C422.  On information and belief, after learning that AMERICAN already had received a copy of SOVICH's November 11, 2005 blast, Mayer wrote to AMERICAN's New York Chief Pilot, Bob Shore ("Shore"), on December 6, 2005, and asked him what AMERICAN was going to do about it.  On information and belief, Mayer was especially interested given the previously-reported discipline (or lack thereof) of SOVICH for his "Policing our own" blast of January 31, 2005.

A422.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 422 of the Complaint and therefore denies those allegations.

C423.  On information and belief, on or about November 16, 2005, AMERICAN received a copy of the SOVICH November 11, 2005 blast.

A423.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 423 and therefore denies those allegations.

C424.  On information and belief, after receiving the copy of the SOVICH November 11, 2005 blast, AMERICAN notified SOVICH of their concerns.

A424.  The APA admits that American notified Sovich about concerns relating to his November 11, 2005, posting, but the APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 424 of the Complaint and therefore denies those allegations.

C425.  On information and belief, after being contacted by AMERICAN, SOVICH requested that APA remove the blast from the archives on the APA web site.

A425.  The APA admits that Sovich removed the blast from the APA website, but denies the remaining allegations of Paragraph 425 of the Complaint.

C426.  On information and belief, Mayer wrote the December 6, 2005 letter to Shore to seek a second test of the parity of treatment for AMERICAN's discipline for union speech when it involved speech by a political opposite of Mayer (SOVICH).

A426.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 426 of the Complaint and therefore denies those allegations.

C427.  On information and belief, despite the November 11, 2005 SOVICH blast being previously brought to AMERICAN's attention, AMERICAN only took action against SOVICH after receiving the December 6, 2005 letter from Mayer and after the blast had been removed from the APA web site at SOVICH's request.

A427.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 427 of the Complaint and therefore denies those allegations.

C428.  On or about July 21, 2006, Mayer notified APA that he was a candidate for re-election to the union office of Chairman of the APA New York Domicile.

A428.  The APA admits the allegations of Paragraph 428 of the Complaint, but denies the date referenced in Paragraph 428.

C429.  On July 21, 2006, APA sent a nationally-broadcast "blast" e-mail informing the union membership of the candidates in pending elections at three domiciles, including Mayer's candidacy.

A429.  The APA admits the allegations of Paragraph 429 of the Complaint, but denies the date referenced in Paragraph 429.

C430.  On July 21, 2006, AMERICAN served "Section 6" notice to APA under the Railway Labor Act, notifying APA that it sought to open collective bargaining negotiations in 60 days to amend the Contract between AMERICAN and APA.

A430.  The APA admits the allegations of Paragraph 430 of the Complaint.

C431.  On July 31, 2006, James W. Anderson ("Anderson"), an Employee Relations representative for AMERICAN assigned to manage collective bargaining between AMERICAN and APA, informed Mayer that AMERICAN would be providing APA with Mayer's unredacted December 6, 2005 letter to Shore because AMERICAN was required to do so under the terms of Section 21.B.4. of the Contract.

A431.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 431 of the Compliant and therefore denies those allegations.

C432.  On information and belief, Mayer told Anderson that it was improper for AMERICAN to provide his letter to APA for several reasons.

A432.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 432 of the Complaint and therefore denies those allegations.

C433.  On information and belief, Mayer told Anderson that disclosure was improper because AMERICAN claimed they could withhold the identity of the complainant in the HELD case at least in part due to purely hypothetical and speculative fear of imagined future retaliation by HELD.

A433.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 433 of the Complaint and therefore denies

those allegations.

C434.  On information and belief, Mayer told Anderson that disclosure was improper because the arbitrator in the HELD case had sustained AMERICAN's right to violate their disclosure obligations under Section 21.BA. based on AMERICAN's purported reasons.

A434.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 434 of the Complaint and therefore denies

those allegations.

C435.  On information and belief, Mayer told Anderson that disclosure was improper because AMERICAN would be assisting SOVICH and his political faction within APA who were already engaged in actual retaliatory attacks against Mayer and such disclosure would only amplify those attacks.

A435.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 435 of the Complaint and therefore denies

those allegations.

C436.  On information and belief, Mayer told Anderson that it was improper because Mayer was a candidate in a union officer election and such disclosure could only have the illegal effect of AMERICAN choosing sides in a union officer election and providing support for SOVICH's political faction within the union to help Mayer's opponent.

A436.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 436 of the Complaint and therefore denies

those allegations.

C437.  On information and belief, Mayer informed Anderson that AMERICAN was motivated to discriminate against him in favor of SOVICH because SOVICH had a long history of granting concessions to AMERICAN and the elimination of Mayer from

the political landscape of APA would provide an advantage to AMERICAN in the soon-to-begin collective bargaining for a new Contract.

A437.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 437 of the Complaint and therefore denies those allegations.

C438.  On information and belief, Mayer informed Anderson that if AMERICAN disclosed his letter to APA, he would have no alternative but to take legal action against AMERICAN for discriminating against him because of his union political positions and his attempt to test AMERICAN's parity of treatment of SOVICH.

A438.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 438 of the Complaint and therefore denies those allegations.

C439.  On information and belief, Mayer informed Anderson that his letter resulted in a counseling entry for SOVICH, but AMERICAN was ready to throw Mayer "under the bus" in "transparent" support of SOVICH and his political agenda.

A439.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 439 of the Complaint and therefore denies those allegations.

C440.  On information and belief, Mayer reminded Anderson that, a year earlier, AMERICAN had concealed the complainant in the HELD case because of his political history with SOVICH and participation with other APA officials, and that such concealment by AMERICAN had caused much more than a counseling entry for HELD; It caused HELD's actual termination.

A440.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 440 of the Complaint and therefore denies those allegations.

C441.  On information and belief, Anderson subsequently and falsely told Mayer that the difference between the HELD and SOVICH cases was that the redacted documents supplied by REEDY were never introduced into evidence in the HELD case.

A441.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 441 of the Complaint and therefore denies those allegations.

C442.  In the only other case in which AMERICAN sought to impose its rules for speech entirely within the union hall, the employment of a union member was suspended for 90 days for a C&R post in 2003.

A442.  The APA admits that a union member was suspended for 90 days for a C&R post in 2003 but lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 442 of the Complaint and therefore denies those allegations.

C443.  In that case, a complainant came forward, identified herself as the victim of allegedly demeaning comments made by a union member on C&R, and testified against the employee at investigative and arbitration hearings.

A443.  The APA admits the allegations of Paragraph 443 of the Complaint.

C444.  Apart from the larger issues regarding the protected nature of the union hall, the decision in that case primarily turned on whether the grievant was credible in his defense that his comments were political in nature and were not, as AMERICAN alleged, directed at the victim because of her "protected characteristic."

A444.  The APA denies the allegations of Paragraph 444 of the Complaint.  The decision of the System Board of Adjustment in the Treider case found the posting to constitute a violation of the American's Rule 32 and Work Environment Policy notwithstanding the political purpose of the posting.

C445.  In this case, the arbitrator ultimately ruled that the grievant violated the Rules of Conduct inside the union hall and sustained the 90-day suspension.

A445.  The APA admits the allegations of Paragraph 445 of the Complaint.

C446.  After exhausting all other contractual remedies, HELD has filed this action within six months from the receipt of the System Board decision.

A446.  The APA denies that Held has even attempted to exhaust any remedies against the APA but admits the remaining allegations of Paragraph 446 of the Complaint.

C447.  The System Board of Adjustment in this case was convened under the provisions of the RLA which contemplates that such a Board would resolve "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."

A447.  Paragraph 447 of the Complaint asserts legal conclusions, to which no response is required; to the extent a response is required, the allegations are denied.

C448.  The System Board of Adjustment in this case was also convened under the provisions of Section 23 of the Contract to decide "disputes which may arise under the terms of this Agreement."

A448.  Paragraph 448 of the Complaint asserts legal conclusions, to which no response is required; to the extent a response is required, the allegations are denied.

C449.  The issues in this case go well beyond violation of provisions of the Contract and encroach on matters of public policy and federal statute that go beyond the scope and authority of the System Board of Adjustment.

A449.  Paragraph 449 of the Complaint asserts legal conclusions, to which

no response is required; to the extent a response is required, those allegations are

denied.

C450.  When submitting the case to the System Board of Adjustment, HELD
successfully requested that APA's submission should include requested remedies that
went well beyond adjudication of a dispute over just cause for termination and would
have effectively required the System Board to reach findings of fact and conclusions of
law regarding the larger public policy and statutory issues.[42]  [Footnote 42 <u>See</u>, Exhibit 4, APA
submission to System Board of Adjustment, July 25, 2005]

A450.  The APA admits that Held insisted on bringing statutory claims

before the System Board, but denies the attempt to characterize the substance of

those claims or their effect in Paragraph 450 of the Complaint and the

accompanying Footnote 42.


C451.  The System Board decision did not make judgment on whether it was a
violation of the RLA and LMRDA for AMERICAN to interfere with and thereby
exercise control over the internal affairs of the union.

A451.  The APA denies the allegations of Paragraph 451 of the

Complaint.

C452.  In this case, the facts provide evidence that the standard has been met for
judicial intervention for violation of the prohibition against interference by the employer
under the RLA since the interference constitutes a fundamental blow to union or
employer activity and the collective bargaining process itself and the arbitration and
negotiation procedures of the RLA cannot effectively address and resolve the dispute.

A452.  Paragraph 452 of the Complaint asserts legal conclusions, to which

no response is required; to the extent a response is required, the allegations are

denied.

C453.  In passing the LMRDA, Congress found and declared that the enactment
of the Act was necessary "to eliminate or prevent improper practices on the part of labor
organizations, employers, labor relations consultants, and their officers and
representatives which distort and defeat the policies of the Labor Management Relations

Act, 1947, as amended, and the Railway Labor Act, as amended...”[43]  [Footnote 43 <u>See</u>, 29 U.S.C. § 401(c).]

A453.  Paragraph 453 of the Complaint and accompanying Footnote 43 assert legal conclusions, to which no response is required; to the extent a response is required, the allegations are denied.

C454.  Although the provisions of the National Labor Relations Act (“NLRA”), 29 U.S.C. §§ 151-169, do not have a direct application to unions and employers operating under the provisions of the Railway Labor Act, courts have allowed and made analogous reference to NLRA provisions when interpreting the intent of Congress with respect to the rights of union members under the RLA. Accordingly, it is appropriate to note that Congress defined a series of unfair labor practices by employers within the NLRA in Section 8 including the statement that “It shall be an unfair labor practice for an employer... to dominate or interfere with the formation or administration of any labor organization.”[44]  [Footnote 44 <u>See</u>, 29 U.S.C. § 158.(a)(2).]

A454.  Paragraph 454 of the Complaint and accompanying Footnote 44 assert legal conclusions, to which no response is required; to the extent a response is required, the allegations are denied.

C455.  In spite of the clear intent of the LMRDA to protect the civil liberties of union members, provide fair elections in unions, and allow recourse in federal courts if the law is abused, AMERICAN convinced the arbitrator to issue a decision establishing the untenable precedent that, despite the compelling and definitively authoritative testimony of Professor Clyde Summers – who personally authored much of the LMRDA – in which he explained that Congress had no intention to allow employers to discipline members for their union political speech when the union could not do the same, will now allow AMERICAN to punish employees for being critical of an APA official even though the union is explicitly prohibited by law from doing so.

A455.  Paragraph 455 of the Complaint asserts legal conclusions, to which no response is required; to the extent a response is required, the allegations are denied.  The APA does admit, however, that the APA retained Professor Clyde

Summers as an expert witness for the System Board Hearing, that Professor

Summers had a key role in what ultimately became the LMRDA and that

Professor Summers was an "authoritative" witness at the hearing.

## CLAIMS FOR RELIEF

## COUNT I

In response to Count I of the Complaint, the APA incorporates Paragraphs 1-455

of its Answer as if fully set forth herein.

C456.  The defendant AMERICAN willfully interfered with an internal political dispute regarding APA members' choice of representatives and the performance of a union official that was taking place entirely within the confines of the union hall by terminating the employment of HELD.

A456.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 456 of the Complaint and therefore denies

those allegations.

C457.  Defendant JIRSCHELE perjured himself when he stated that REEDY was just a line pilot and by representing that he believed REEDY was "not very good with e-mail."

A457.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 457 of the Complaint and therefore denies

those allegations.

C458.  Counsel for AMERICAN, RJ Hendricks, suborned perjury in order to conceal the heritage of major political differences and relationships between HELD, REEDY, and SOVICH and to deny HELD his fundamental right to confront his accuser and examine the truthfulness of the complainant's supposed allegations and motives for making them.

A458.  The APA lacks information sufficient to form a belief as to the

truth of the allegations of Paragraph 458 of the Complaint and therefore denies

those allegations.

C459. On information and belief, one of the motives for the actions of each of the defendants to act against HELD, including the actions of JIRSCHELE, involved AMERICAN choosing sides to snuff out a vocal political adversary and thereby influence the political direction and policies of the union in general.

A459. The APA denies the allegations of Paragraph 459 of the Complaint insofar as those allegations concern the APA, Sovich or Condes. The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 459 of the Complaint and therefore denies them.

C460. AMERICAN violated Section 24.B.4 of the Contract so as to deprive HELD of a meaningful opportunity to develop and present evidence in his defense.

A460. Paragraph 460 of the Complaint states a legal conclusion to which no response is required; to the extent a response is required; the allegations of Paragraph 460 are denied.

Plaintiff's allegations of "unlawful conduct" and "unlawful activity" by American and the relief he claims constitute legal conclusions, to which no response is required; to the extent a response is required, those allegations are denied.

## COUNT II

In response to Count II of the Complaint, the APA incorporates Paragraphs 1-460 of its Answer as if fully set forth herein.

C461. In February 2004, APA informed AMERICAN that C&R was protected by the United States Constitution and federal law, but when HELD was suspended and then terminated for political discussion entirely within C&R, APA repeatedly refused to engage the substantial resources and experience of outside counsel to defend the fundamental institutional interests and the rights of union members.

A461. The APA admits that it claimed legal protections for C&R to American in February 2004, but denies the remaining allegations of Paragraph 461 of the Complaint. The APA would state that it made the same claims for

legal protection to the System Board in the Held case, but the System Board, and

chiefly the neutral arbitrator, decided otherwise due to the content of Held's C&R

posting and his express invitation that the posting be distributed widely.

C462.  The decision not to assign and use the substantially-superior resources and capabilities of outside counsel was made by the APA President immediately after HELD was suspended, and publicly reinforced after HELD was terminated by a vote by the APA Board of Directors.

A462.  The APA denies the allegations of Paragraph 462 of the

Complaint.  The APA further states that the APA "assign[ed] and use[ed]" the

services of Kathy L. Krieger, Esq., a partner in the General Counsel Firm, to

advocate for Held as a member of the System Board.


C463.  The decision not to engage outside counsel was, in effect, an admission and signal to AMERICAN by APA that it would not devote substantial legal resources to defend its 2004 position regarding the protected nature of C&R.

A463.  The APA denies the allegations of Paragraph 463 of the

Complaint.

C464.  APA gave a green light to AMERICAN and provided notice that AMERICAN need not prepare a major defense because APA was not committed to HELD and APA was not committed to a vigorous effort to protect its previously-expressed institutional interests.

A464.  The APA denies the allegations of Paragraph 464 of the

Complaint.

C465.  When the arbitrator set aside the clear meaning and intent of Section 21.B.4. and ruled that AMERICAN could conceal REEDY's identity and thereby deny HELD the ability to prove the true internal union political reason for REEDY's involvement and discover the complicity of SOVICH and other APA officials, APA impermissibly allowed the hearing to proceed and took no action in this case, or any time subsequent, to remedy the very bad precedent of allowing secret complainants, or even no complainant at all, to arbitrarily initiate discipline and termination of employees, especially union members engaged in protected activity entirely within the union hall.

A465.  The APA denies the allegations of Paragraph 465 of the

Complaint.  The APA further states that it petitioned the neutral arbitrator for a

"John Doe" subpoena to identify the claimant but the arbitrator denied that

petition and ruled that the complainant's identity was irrelevant.  Short of refusing

to participate in the System Board hearing after the arbitrator's ruling – a decision

that would have delivered no benefit to Held – the APA had no means under

System Board procedures to do anything to "remedy" the arbitrator's ruling.

C466.  On information and belief, APA never made any meaningful protest or filed any grievance over AMERICAN's violation of Section 21.B.4.

A466.  The APA denies the allegations of Paragraph 466 of the

Complaint.

C467.  Two weeks prior to HELD's January 22, 2005 C&R post, APA announced that the APA President had filed a "Presidential Grievance" protesting AMERICAN's violation of the Contract in its interpretation and application of Rule 32.

A467.  The APA admits the allegations of Paragraph 467 of the

Complaint.

C468.  On information and belief, this grievance was all for show. HELD found out too late that APA was not serious about protecting the union hall from corporate control.  On information and believe, over a year and a half has gone by since the Presidential Grievance was filed and there has been no resolution, let alone prosecution, of this grievance by APA.

A468.  The APA admits that the Presidential Grievance referenced in

Paragraph 468 of the Compliant has not yet been resolved but denies the

remaining allegations of Paragraph 468.

C469.  APA consistently engaged in delay, denial, and subterfuge when responding to most of HELD's requests for information and documents which HELD reasonably calculated would be useful in mounting an effective defense.

A469.  The APA denies the allegations of Paragraph 469 of the Complaint, including the assertions that Held's requests were either reasonable or useful to the defense of the case.

C470.  APA denied HELD the ability to be fully engaged and effective in his defense and devoted inadequate legal resources to the job such that many aspects of proper discussion, coordination, and preparation for events never occurred.

A470.  The APA denies the allegations of Paragraph 470 of the Complaint.  As Professor Clyde Summers, the expert retained to advocate for Held, testified under oath, the APA "vigorously" defended Held and expended a "massive effort" to do so.  Complaint Ex. 5 at 335-36 (System Board Hearing Transcript).  As Held himself admits, Professor Summers delivered "authoritative" and "compelling" testimony at the hearing.  Complaint ¶ 455.

C471.  When HELD would ask about covering specific issues that APA had allowed to fall through the cracks, HELD would be told by Kennedy it was too late to address his concerns.

A471.  The APA denies the allegations of Paragraph 471 of the Complaint.

C472.  APA engaged in private communication regarding HELD's case without disclosure to HELD and contrary to the interests of HELD.

A472.  The APA denies the allegations of Paragraph 472 of the Complaint.

C473.  APA's systematic negligent, irregular, and prejudicial conduct during all phases of processing HELD's Article VII complaint demonstrated consistent and widespread institutional hostility by APA toward HELD.

A473.  The APA denies the allegations of Paragraph 473 of the Complaint.

C474.  APA didn't file this suit themselves, despite putting AMERICAN on notice almost a year prior to HELD's January 22, 2005 C&R post that "APA's C&R Website is a restricted, members-only internal forum serving APA members' and APA's Constitutionally protected freedom of speech and association, as well as their rights and interests under federal labor law."

A474.  The APA admits the allegations of Paragraph 474 of the Complaint insofar as they accurately quote a passage from then President Darrah's February 24, 2004, letter to Captain Bob Shore (see Complaint ¶ 65) and admits that APA did not file this suit.  The APA denies the remaining allegations of Paragraph 474 of the Complaint and further states that the February 24, 2004, letter was sent over two years before the System Board of Adjustment determined that Plaintiff's hate speech was not protected.

C475.  APA didn't file this suit themselves, despite their conclusion in their February 22, 2006 dissent to the System Board decision in which they stated that HELD's January 22, 2005 C&R post was "speech that is strongly protected under both of the federal statutes in this comprehensive labor law scheme [LMRDA and RLA] – that is, speech to and among union members, in a password protected union forum, in an ongoing union political controversy."

A475.  The APA admits the allegations of Paragraph 475 of the Complaint.  The APA further states that, notwithstanding the positions asserted in the dissent by APA representatives, the arbitrator decided that Held's "hate speech" merited no such protection.

C476.  APA knew that REEDY was the complainant and withheld this information from HELD knowing that it would have assisted in HELD's defense.

A476.  The APA admits that it eventually learned that Reedy was the complainant but denies the remaining allegations of Paragraph 476 of the Complaint.

C477.  APA withheld the information about REEDY from HELD because it would have exposed the complicity of the other defendants in this Complaint who had engaged in misconduct.

A477.  The APA denies the allegations of Paragraph 477 of the Complaint.

C478.  APA mischaracterized the facts and blamed HELD for losing the arbitration in a nationally-transmitted e-mail on March 22, 2006.

A478.  The APA denies the allegations of Paragraph 478 of the Complaint.  The APA further states that the System Board found that Held, on his own and without the urging, assistance or advice of any APA personnel, decided to make the C&R posting and in it to invite readers to retransmit it without limitation.

WHEREFORE, the APA denies that it engaged in any wrongful or unlawful conduct or activity of any sort, including any breach of the duty of fair representation. The APA denies that Held is entitled to the relief requested or to any other relief.

## COUNT III

In response to Count III of the Complaint, the APA incorporates Paragraphs 1-478 of its Answer as if fully set forth herein.

C479.  HELD was employed by AMERICAN pursuant to the valid and enforceable Contract between the APA and AMERICAN which entitled HELD the reasonable expectation of his employment until retirement.

A479.  The APA admits the allegations of Paragraph 479 of the Complaint.

C480.  JIRSCHELE, REEDY, CONDES and SOVICH were fully knowledgeable of HELD's contractual employment entitlements and reasonable expectations of continued employment pursuant to the Contract between the APA and AMERICAN;[.]

A480.  The APA admits the allegations of Paragraph 480 of the Complaint as they concern Sovich and Condes but lacks information sufficient to form a belief as to the truth of the allegations as they concern Reedy and Jirschele and therefore deny those allegations.

C481.  JIRSCHELE committed perjury to conceal and misdirect attention from his relationship with former union official and supervisory pilot REEDY (both of whom were mutually aware of their common politically adverse relationship with HELD), a deception that was intentionally perpetrated without lawful justification to induce AMERICAN to breach its contract with HELD.

A481.  The APA lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 481 of the Complaint and therefore denies those allegations.  To the extent that Paragraph 481 asserts legal conclusions, no response is required; to the extent a response is required, the allegations are denied.

C482.  REEDY either misrepresented to JIRSCHELE or conspired with JIRSCHELE to misrepresent the basis of his alleged complaint because (a) he did not read the HELD post on C&R as claimed by AMERICAN, and (b) he had no reason to fear being involuntarily exposed to co-workers as a homosexual because, on information and belief, he is not a homosexual, and (c) he obtained the documents he transmitted to JIRSCHELE from CONDES, SOVICH, or other APA officers or agents for the express purpose of transmitting it to AMERICAN to cause HELD to be terminated, thereby intentionally and without lawful justification, and induced AMERICAN to breach its contract with HELD.

A482.  The APA denies the allegations of Paragraph 482 of the Complaint insofar as they concern Condes, Sovich or "other APA officers or agents."  The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 482 and therefore denies those allegations.

C483.  Prior to any complaint being made to AMERICAN, CONDES had private conversations with APA officials and staff regarding HELD's post and then contacted HELD without disclosing the existence and substance of those discussions and, when HELD did not provide the answers or information CONDES was seeking, CONDES

contacted REEDY or SOVICH who then provided REEDY with the documents he transmitted to JIRSCHELE for the express purpose of transmitting it to AMERICAN to cause HELD to be terminated, thereby intentionally and without lawful justification induced AMERICAN to breach its contract with HELD.

A483.  The APA admits that Condes had conversations with APA officials and staff regarding Held's C&R posting and subsequently contacted Held.  The APA denies the remaining allegations of Paragraph 483 of the Complaint.  The APA further states that when Condes contacted Held, he asked him to allow the APA to remove the C&R posting in order to protect Held.  Held not only refused that request but threatened to sue Condes and the APA if the posting were removed.  The APA specifically denies that Condes engaged in the wrongdoing alleged in Paragraph 483 or any other wrongdoing.

C484.  Prior to any complaint being made to AMERICAN, SOVICH engaged in substantial discussion about HELD's post with other members of the APA Board of Directors, including CONDES, in which he (a) admitted that APA had neither the authority nor policies to punish HELD for his union political speech, and (b) stated that AMERICAN would receive a complaint and HELD would then be terminated.

A484.  The APA denies the portion of Paragraph 484 of the Complaint designated "a" and "b" and admits the remaining allegations of Paragraph 484.

C485.  Prior to any complaint being made to AMERICAN, SOVICH ordered APA to produce and distribute to at least all other members of the APA Board of Directors, including CONDES, the "Rob Held Please Post" Posters with the specific purpose and intent that it be posted in the workplace of AMERICAN to attack HELD, draw negative attention to HELD, and cause AMERICAN to terminate HELD.

A485.  The APA denies the allegations of Paragraph 485 of the Complaint.

C486.  SOVICH, through his actions and involvement in the events described in this complaint intentionally and without lawful justification, induced AMERICAN to breach its contract with HELD.

A486.  The APA denies the allegations of Paragraph 486 of the Complaint and specifically denies that Sovich engaged in the wrongdoing alleged or any other wrongdoing.

C487.  AMERICAN was induced by the actions of JIRSCHELE, REEDY, CONDES, and SOVICH to breach its contract with HELD and violate the RLA and LMRDA when it wrongfully inserted itself into an ongoing political dispute and subsequently suspended and terminated HELD for his political speech made entirely within the union hall.

A487.  The APA denies the allegations of Paragraph 487 of the Complaint insofar as they concern Condes or Sovich and specifically denies that either Condes or Sovich engaged in the wrongdoing alleged or any other wrongdoing. The APA lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 487 and therefore denies those allegations.  To the extent that Paragraph 487 asserts legal conclusions, no response is required; to the extent a response is required, the allegations of Paragraph 487 are denied.

C488.  HELD has suffered damages caused by the loss of his employment with AMERICAN.

A488.  Although Held has undoubtedly experienced certain losses as a result of his termination, none of those losses – all of which were self-generated – constitute colorable legal "damages."  Accordingly, the APA denies the allegations of Paragraph 488 of the Complaint.

WHEREFORE, the APA denies that either Condes or Sovich engaged in any unlawful conduct or any violation of Illinois or any other source of law.  The APA also denies that Held is entitled to any award of damages or to any other relief.

## DAMAGES

The APA denies that Held has suffered any legally colorable damages, either in the form set forth in the Damages section of the Complaint or in any other form.

## PRAYER FOR RELIEF

The APA denies that Held is entitled to any of the relief requested as against the APA, Sovich and/or Condes or to any other form of relief.

WHEREFORE, the APA prays that

1.   All of Held's claims against the APA, Sovich and/or Condes be dismissed with prejudice and that Held take nothing by virtue of this lawsuit;

2.   The Court award the APA its costs in defending this action, including the legal fees and expenses it incurs; and

3.   The Court award the APA such other relief as it may deem just and proper.

## AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a claim upon which relief may be granted.

2.   The Plaintiff has failed to exhaust his internal union remedies.

3.   The Complaint fails under the doctrine of assumption of the risk.

4.   The Complaint fails under the doctrine of contributory negligence.

5.   The Complaint fails for lack of causation.

6.   The Complaint fails because, as the System Board found, Plaintiff, on his own and without the encouragement or assistance of any defendant, engaged in "hate speech" and encouraged the widest possible distribution of that "hate speech."

7.      The Complaint fails because it alleges no colorable grounds for overturning the decision of the System Board arbitral panel.

8.      The Complaint fails because no federal or state labor law protects the purveyor of hate speech.

9.      The Complaint fails because the plaintiff voluntarily and intentionally sought out the discipline he received.

10.     The Complaint fails under the doctrines of waiver and estoppel.

11.     The Complaint fails because in the absence of a colorable claim of breach of a collective bargaining agreement in the circumstances alleged, no claim of breach of the duty of fair representation will lie.

12.     The Complaint fails because Plaintiff voluntarily and intentionally raised federal labor law claims before the System Board, and the System Board conclusively decided those claims.

13.     The Complaint against Condes and Sovich fails because those claims are preempted and extinguished by federal law.

14.     The Complaint fails because Plaintiff's injuries were entirely self-inflicted, and he has no colorable claim for damages.

15.     The Complaint fails because the APA's duty of fair representation does not encompass a duty to litigate Plaintiff's termination in Court.

16.     The Complaint fails because Plaintiff lacks standing to pursue free speech claims on behalf of other union members or employees.

17.     The Complaint fails under the doctrine of arbitration and award.

Respectfully submitted,


/s/ Wesley Kennedy
Wesley Kennedy (6188089)
ALLISON, SLUTSKY & KENNEDY, P.C.
230 West Monroe Street
Chicago, IL  60606
Tel: (312) 364-9400
Fax: (312) 364-9410

Steven K. Hoffman *(Pro Hac Vice application pending)*
Katie B. Feiock *(Pro Hac Vice application pending)*
JAMES & HOFFMAN, P.C.
1101 17th St., NW
Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Dated: October 17, 2006                    Attorneys for Defendants Allied Pilots
                                           Association, James G. Sovich and
                                           James A. Condes

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 17, 2006, a copy of the foregoing Answer was served on the following person via first class mail, postage pre-paid:

Robert S. Held
3142 Redwood Court
Flossmoor, Illinois 60422-2267

and on the following persons electronically by filing it with the Court's EM/ECF system which will send notification of such filing and link to access this document:

Hans Stucki, Esq.
Jason A Schmidt
Epstein Becker & Green, P.C.
150 North Michigan Avenue
Chicago, Illinois 60601-7553

Charles Clark Jackson
Alison Bowman Willard
Morgan Lewis & Bockius, LLP
77 West Wacker Drive
5th Floor
Chicago, IL 60601

/s/ Wesley Kennedy